**Daniel KIMBRO,**
**Plaintiff–Appellant/Cross–Appellee,**

**v.**

**ATLANTIC RICHFIELD COMPANY,**
**Defendant–Appellee/Cross–Appellant.**

Nos. 87–3903, 87–4007.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 1, 1989.

Decided Nov. 14, 1989.

Deborra E. Garrett, Raas, Johnsen, Garrett & Stuen, Bellingham, Wash., for plaintiff-appellant/cross-appellee.

Clemens H. Barnes, Graham & Dunn, Seattle, Wash., for defendant-appellee/cross-appellant.

Before ALARCON, FERGUSON and THOMPSON, Circuit Judges.

FERGUSON, Circuit Judge:

Appellant Daniel Kimbro appeals the district court's judgment in favor of Atlantic Richfield (ARCO) in his action alleging handicap discrimination, breach of contract, and violations of the Employee Retirement Income Security Act (ERISA). Kimbro, a machinist at an ARCO refinery, was discharged after ten years of employment with the company for excessive absenteeism and tardiness. Kimbro contends that ARCO failed to make reasonable accommodations to his physical impairments and thus violated Washington's statutory provision forbidding discrimination against the disabled in the workplace. He also claims that ARCO breached their employment contract by discharging him before he had an opportunity to use all of his sick leave benefits, and by not considering the proper factors in its decision to terminate him. Finally, Kimbro alleges that his discharge was in retaliation for his past use of ERISA-protected employee sick leave benefits. ARCO appeals the district court's denial of its request for attorneys' fees. We affirm in part and reverse in part.

## I.

Plaintiff Daniel Kimbro was hired as a machinist by ARCO in 1971 to work in the Cherry Point, Washington, oil refinery. Since beginning operations in 1971, ARCO's Cherry Point refinery has maintained a personnel policy self-described as a "union-free environment policy." Pursuant to this policy, ARCO offers wages and benefits comparable to those offered at unionized oil refineries in an effort to maintain a loyal group of employees who feel no need to elect a union to represent their interests. Among these benefits are a sick leave plan [hereinafter Sick Leave Plan], two disability plans, a retirement plan, and various types of unpaid leaves of absence. The Sick Leave Plan, which is relevant to this litigation, allows a worker to collect his salary during absences attributable to non-occupational illness or injury.[1]

ARCO also maintains a written policy describing its attendance requirements. ARCO's attendance policy sets forth an attendance goal which includes substantially fewer days absence from work than the number of sick leave days which would accrue to a 10–year employee. This policy requires ARCO to follow a three-step process before discharging an employee for unsatisfactory attendance. As a first step, the employee is to receive informal counseling from his immediate supervisor. If attendance continues to be a problem, the policy calls on the supervisor to provide additional counseling and to place a written memorandum in the employee's file. The policy requires ARCO to issue a final warning before discharging an employee for attendance problems.

Kimbro maintained a satisfactory attendance record during his first five years at ARCO. Although Kimbro missed intermittent days for various illnesses and used sick leave days for those absences, he had no major illness or injury which required him to miss work over an extended period. In 1976, however, Kimbro was diagnosed as suffering from a condition known as "cluster migraine." This condition is characterized by sporadic and debilitating episodes of migraines. Each migraine lasts up to an hour and the headaches occur in clusters of several per day over a period of weeks or months. During acute episodes, Kimbro is unable to work, sleep, or perform any meaningful task. Between clusters, which can be months or even years apart, normal activity is unimpaired. Kimbro began taking medication and receiving treatment for his condition in 1976. He missed several weeks of work in late 1976 as a result of cluster migraines.

Kimbro also missed a substantial amount of work between 1977 and 1980, primarily as a result of back surgery in 1977. While Kimbro experienced some occasional migraines during this period, he was forced to miss work only a few times on account of his migraine condition.

In 1979, Kimbro received an oral reprimand from his supervisor, Jack Jackson, because his attendance record was unsatis-

---

1. Benefits under the Sick Leave Plan will hereinafter be referred to as sick leave days.

factory. In August 1980, in accordance with the attendance policy, Jackson counseled Kimbro again on his poor attendance and placed a memorandum in Kimbro's personnel file.

In early 1981, Kimbro's cluster migraine condition recurred. As a result, he was absent and tardy several times during this period. He was also absent twice for other non-migraine related illness during early 1981. In March 1981, ARCO issued a final warning to Kimbro regarding his poor attendance. He was warned that he would be discharged if he were tardy or absent again in the foreseeable future. Kimbro was tardy as a result of his migraine condition three times after receiving this final warning. On June 10, the date of his third late arrival to work, Kimbro was discharged for excessive absenteeism.

At the time of his discharge, Kimbro carried an unexhausted sick leave equivalent to ten weeks of full salary and at least 36 weeks of half salary. While Kimbro used his sick leave days intermittently on the days he was absent from work because of a migraine or other illness, and occasionally compensated for hours missed on those days he arrived late to work by staying after regular operating hours to perform repair work, he did not formally request that he be permitted to continue either of these practices as an alternative to discharge. Nor did he request that any other accommodation be made to his migraine condition upon receiving either the final warning or the final termination notice.

Kimbro continued to experience acute cluster migraines after his discharge from ARCO and continued to seek treatment and medication for his condition. In late 1985, however, he began to receive treatment from a psychologist which enables him to exert some control over his migraines. He claims that this current treatment allows him to work full-time without substantial interference.

Kimbro filed this action against ARCO in February 1986, alleging, among other things, that ARCO (1) violated Washington's law against discrimination, Wash.Rev. Code § 49.60, by failing to attempt a reasonable accommodation to his migraine condition, that it (2) breached its employment contract with Kimbro, and (3) violated ERISA, 29 U.S.C. § 1140, by discharging him in retaliation for use of his federally-protected benefits.[2] The district court held a bench trial and rendered judgment in favor of ARCO on all claims. It denied, however, ARCO's request for attorneys' fees under ERISA, 29 U.S.C. § 1132(g).

## II.

■ A district court's findings of fact are reviewed under the clearly erroneous standard. *LaDuke v. Nelson*, 762 F.2d 1318, 1321 (9th Cir.1985); Fed.R.Civ.P. 52(a). Questions of law are, of course, reviewed *de novo*. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). A district court's interpretation of state law is reviewed under the same independent *de novo* standard as are questions of federal law. *Matter of McLinn*, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).

## III.

In recognition of the significant impediments that confront the disabled in the workplace, the Washington legislature amended the state's employment discrimination law in 1973 to include a prohibition against discrimination based on physical, mental or sensory handicaps. *See* Wash. Rev.Code § 49.60.180.[3] The Washington

---

**2.** Kimbro also alleged in his lawsuit that ARCO violated ERISA, 29 U.S.C. § 1022, by failing to inform him about or assist him in obtaining ERISA-protected benefits. The district court found in favor of ARCO on this issue as well. Kimbro has abandoned this claim on appeal.

**3.** It is an unfair practice for any employer:

(1) To refuse to hire any person because of such person's age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical handicap, unless based upon a bona fide occupational qualification: *Provided,* That the prohibition against discrimination because of such handicap shall not apply if the particular disability

Supreme Court has held that an employer commits an unfair employment practice under § 49.60.180 when it discharges an employee without attempting to make reasonable accommodations to the employee's physical, mental, or sensory limitations. *Reese v. Sears, Roebuck & Co.*, 107 Wash.2d 563, 578–80, 731 P.2d 497, 506 (1987); *Dean v. Municipality of Metropolitan Seattle*, 104 Wash.2d 627, 632–33, 708 P.2d 393, 396–400 (1985); *Holland v. Boeing*, 90 Wash.2d 384, 389, 583 P.2d 621, 623–24 (1978); Wash.Admin.Code § 162–22–080(1).

Kimbro contends that ARCO's failure to attempt to reasonably accommodate his migraine condition prior to discharge constitutes a breach of ARCO's statutory duty under Washington's handicap discrimination law. The district court found that while Kimbro's condition indeed qualified as a handicap under Washington law, ARCO could not be held liable for failing to attempt a reasonable accommodation since the ARCO management personnel who made the decision to terminate Kimbro were not personally aware that many of Kimbro's absences throughout his period of employment, including those immediately prior to his discharge in 1981, were attributable to his cluster migraine condition. Thus, the district court concluded that the ARCO management's lack of personal knowledge precluded the imposition of liability on ARCO for failing to make a reasonable accommodation.

While we find no error in the district court's finding that Kimbro suffered from a handicap within the meaning of Wash. Rev.Code § 49.60.180, we believe that the district court erred in finding that ARCO management's lack of personal knowledge of Kimbro's migraine condition insulates the company from liability; ARCO was in fact on notice of Kimbro's condition as a result of Kimbro's supervisor's full awareness of his condition and thus must be held responsible for any failure to attempt a reasonable accommodation. Since the district court's findings and the record demonstrate that ARCO could have attempted a reasonable accommodation of Kimbro's condition but failed to do so, ARCO's conduct in this case constitutes an unfair employment practice under Washington's statutory prohibition against handicap discrimination.

### A.

■ As an initial matter, we note that the district court clearly did not err in finding that Kimbro's cluster migraine condition constituted a handicap within the meaning of Wash.Rev.Code § 49.60.180. In *Phillips v. City of Seattle*, 111 Wash.2d 903, 766 P.2d 1099, 1101–02 (1989), the Supreme Court of Washington adopted Wash. Admin.Code § 162–22–040 as the applicable definition for "handicap" in unfair practice cases brought under Wash.Rev.Code § 49.60.180.[4]

---

prevents the proper performance of the particular worker involved.

(2) To discharge or bar any person from employment because of such person's age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical handicap.

(3) To discriminate against any person in compensation or in other terms or conditions of employment because of such person's age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical handicap.

*Id.* (emphasis in original).

4. Wash.Admin.Code § 162–22–040 provides:

(1) For the purpose of determining whether an unfair practice under RCW 49.60.180, 49.-60.190, or 49.60.200 has occurred:

(a) A condition is a "sensory, mental, or physical handicap" if it is an abnormality and is a reason why the person having the condi-

tion did not get or keep the job in question. . . . In other words, for enforcement purposes a person will be considered to be *handicapped* by a sensory, mental, or physical condition if he or she is *discriminated against because of the condition* and the condition is abnormal.

(b) "The presence of a sensory, mental, or physical handicap" includes, but is not limited to, circumstances where a sensory, mental, or physical condition:

(i) Is medically cognizable or diagnosable;

(ii) Exists as a record or history; or

(iii) Is perceived to exist, whether or not it exists in fact.

(2) An example of subsection (1)(b)(ii) is a medical record showing that the worker had a heart attack five years ago. An example of subsection (1)(b)(iii) is rejection of a person for employment because he had a florid face

First, the record strongly suggests that Kimbro's attendance record from 1976 to 1981 would not have been substandard but for his migraine-related absences. More importantly, his final warning and ultimate discharge for excessive absenteeism were precipitated by his migraine-related absences. Thus, the record clearly demonstrates a sufficient causal connection between Kimbro's termination and his migraine condition to satisfy § 162–22–040(1)(a).

Kimbro's condition also falls well within the second prong of the applicable standard. Kimbro has been diagnosed as suffering from a recognized medical condition known as cluster migraines. His medical record indicates that he has been plagued by cluster migraines, with varying levels of intensity and frequency, since 1976. Accordingly, Kimbro's cluster migraine condition is both medically cognizable and exists as a matter of record. *See* § 162–22–040(b)(i)(ii), (iii). Consequently, Kimbro clearly was handicapped under Washington antidiscrimination law.[5]

### B.

As noted above, the district court reasoned that because ARCO management did not have sufficient knowledge of Kimbro's migraine condition, ARCO could not be held responsible for any failure to attempt a reasonable accommodation. While the district court committed no error in concluding that ARCO management personnel were unaware of Kimbro's condition, the district court erred as a matter of law in finding that ARCO could not be held liable in this case for failing to accommodate Kimbro's condition.

There is substantial evidence in the record to support the finding that ARCO management personnel who made the final decision to discharge Kimbro were personally unaware of Kimbro's migraine condition and its significant causative effect on Kimbro's absenteeism and tardiness. While testimony at trial revealed that management personnel were aware of the fact that Kimbro had been missing work because of headaches and that Jack Jackson, Kimbro's supervisor, had discussed Kimbro's headache difficulties with some of the management, there is no evidence which clearly demonstrates that any of the management personnel knew or believed that Kimbro suffered from a severe diagnosable medical condition.

The record does demonstrate, however, that Jackson was fully aware of the fact that Kimbro's headaches were a manifestation of a serious medical condition. The record reveals that Kimbro frequently discussed his condition with Jackson, Jackson knew Kimbro was receiving medication and treatment for the condition, and Jackson personally witnessed the debilitating effects of the headaches. ARCO's liability for failure to attempt reasonable accommodations thus turns on the extent to which Jackson's knowledge of the severity of Kimbro's migraine condition can be imputed to ARCO.

Since reasonable accommodation cases rarely involve a dispute over whether the employee actually had notice of the physical disability at issue, there is a dearth of authority on the propriety of imputing knowledge from an employee-supervisor to

and the employer thought that he had high blood pressure, but in fact he did not have high blood pressure.
(Emphasis in original).

**5.** It should be noted that *Phillips'* adoption of Wash.Admin.Code § 162–22–040 as the appropriate handicap definition for unfair employment practice cases overturned *Reese,* 107 Wash.2d at 579, 731 P.2d at 506. *Reese* had approved of Wash.Admin.Code § 162–22–030 as the proper handicap standard, *see id,* a far narrower standard than that set forth in *Phillips.* See Wash.Admin.Code § 162–22–030 (to qualify as a handicap, "impairments must be material rather than slight; static and permanent in that

they are seldom fully corrected by medical replacement, therapy, or surgical means"). However, the district court apparently applied the *Reese* definition to determine whether Kimbro's condition qualified as a handicap, since the supreme court had not yet announced its decision in *Phillips* at the time of Kimbro's trial. In light of the fact that the district court found that Kimbro's condition qualified as a handicap even under the narrower *Reese* test, and that the record clearly supports a finding of the existence of a handicap under *Phillips,* we believe it is proper to affirm the district court's conclusion on this issue.

the employer in this type of action. Consequently, we must turn to traditional agency/employer-employee principles to determine whether ARCO should be charged with knowledge of Kimbro's condition in this case. *Cf. Meritor Savings Bank v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) (courts should look to agency principles for guidance in determining employer liability under Title VII for sexual harassment by their supervisors).

It is well settled under Washington law that " 'the principal is chargeable with, and bound by, the knowledge of or notice to his agent received while the agent is acting as such within the scope of his authority and in reference to a matter over which his authority extends.' " *Zwink v. Burlington Northern, Inc.*, 13 Wash.App. 560, 566, 536 P.2d 13, 17 (1975) (quoting 3 Am.Jur.2d *Agency* § 273 at 635 (1962)); *Pilling v. Eastern & Pacific Enterprises*, 41 Wash. App. 158, 163, 702 P.2d 1232, 1236 (1985) ("Knowledge of the agent is imputed by law to the principal."); *Roderick Timber Co. v. Willapa Harbor Cedar Products, Inc.*, 29 Wash.App. 311, 316–17, 627 P.2d 1352, 1355 (1981) ("As a general rule, the knowledge of the agent will be imputed to the principal only where it is relevant to the agency and the matters entrusted to the agent."); *Rocky Mountain Fire & Casualty Co. v. Rose*, 62 Wash.2d 896, 903, 385 P.2d 45, 49 (1963) (same); Restatement (Second) of Agency § 272 (1958). More specifically, if notification is given to an agent who has, or appears to have authority " 'either to receive it, to take action upon it, or to inform the principal or some other agent who has duties in regard to it,' " then such notice is chargeable to the principal. *Roderick Timber*, 29 Wash.App. at 317, 627 P.2d at 1355 (quoting Restatement (Second) of Agency § 268, comment c (1958)).

Moreover, as the court in *Zwink* recognized, these traditional agency principles are fully applicable in the employment context. 13 Wash.App. at 566, 536 P.2d at 17 ("[a]lthough [the imputation of knowledge] rule is stated in the context of principal-agent relationship, it is at least equally applicable to the master-servant or employer-employee relationship"; *see also* Restatement (Second) of Agency § 283 (1958). Indeed, in *Zwink* the court found that, as a matter of law, a defendant railroad company had notice of any malfunctioning or nonfunctioning of a railroad crossing signaling device when an employee crossing guard was stationed at the crossing and in immediate charge of it at the time of the accident. 13 Wash.App.2d at 566–67, 536 P.2d at 16–18.

Applying the foregoing principles to this case, it is clear that ARCO is bound by Jackson's knowledge of Kimbro's medical condition. The district court's findings and Jackson's testimony at trial clearly establish that Jackson not only had authority to receive information regarding Kimbro's medical condition, but also had a responsibility to disclose the nature and severity of ARCO's serious medical condition to ARCO management.

The district court explicitly found that ARCO's "personnel policies, including those related to attendance, are administered through its working supervisors. ARCO's personnel administration policies require employees to bring scheduling problems ... and other personnel-related matters to their supervisors." The district court further found that Jackson "maintained an attendance log upon which was recorded the absences of employees and the reasons for those absences." Moreover, Jackson testified at trial that when ARCO considered taking disciplinary action against an employee, it was customary to hold a meeting with the employee's supervisor and other ARCO management personnel responsible for making a final decision with regard to the particular employee. Jackson explained that at a meeting addressing an employee's attendance record, the attendance log and the reasons for absences are discussed in some detail.

■ Since ARCO personnel policies require that employees raise all personnel-related matters with the supervisor, both the employee and management rely on the supervisor to serve as a conduit for precisely

the type of critical information that was evidently not fully communicated to management in this case. As the imputation of knowledge rule indicates, when an employee-supervisor fails to carry out his responsibilities to both a third person and his employer, the employer must bear the ultimate burden of its employee's error. *See Roderick Timber*, 29 Wash.App. at 317, 627 P.2d at 1355. Thus, since Jackson clearly acquired knowledge of Kimbro's migraine condition while serving in his supervisory function and had a duty to communicate such knowledge to management, ARCO, as a matter of law, was on notice of Kimbro's migraine condition. Accordingly, ARCO should be held responsible for any failure to make a reasonable accommodation.[6]

### C.

Throughout this proceeding, Kimbro has maintained that ARCO could have reasonably accommodated his disability in one of three ways: (1) by continuing to allow him to use his accumulated sick leave for those days or hours in which his migraine prevented him from working; (2) by continuing to permit him to work after normal operating hours to compensate for any time missed as a result of his headaches; (3) by granting a leave of absence in June 1981 to provide him with an opportunity to make it through the 1981 episode of cluster migraines and to seek long-term effective treatment for his migraine condition.

■ ARCO contends that, notwithstanding its notice of Kimbro's migraine condition, its failure to make any of the proposed accommodations does not constitute an unfair employment practice under § 49.60.180. While ARCO appeared to concede at oral argument that § 49.60.180 places an affirmative obligation on an employer to come forward with reasonable accommodations even in the absence of a formal request from a handicapped employee,[7] it maintains nonetheless that liability should not be imposed since (1) the first two accommodations would have imposed an undue hardship on ARCO and (2) the statute does not obligate an employer to offer a leave of absence to a handicapped employee when there is no established treatment program available for the employee's condition. We shall consider each of ARCO's contentions in turn.

■ As an initial matter, we note that whether a particular accommodation would have imposed an undue hardship on the employer is a question of fact. *Phillips*, 111 Wash.2d at 911, 766 P.2d at 1103; *Reese v. Sears, Roebuck & Co.*, 107 Wash.2d 563, 580, 731 P.2d 497, 506–07 (1987). Wash. Admin.Code § 162–22–080(3) sets forth the standard for determining whether a proposed accommodation in fact places undue hardship on the employer. The regulation provides:

**6.** ARCO neither disputes the fact that Jackson knew Kimbro suffered from a severe migraine condition nor that such knowledge is imputable to ARCO. It contends, however, that since Jackson did not know that Kimbro actually suffered from a "handicap," within the meaning of § 49.60.180, ARCO cannot be liable even if ARCO is chargeable with Jackson's knowledge. ARCO's argument is clearly frivolous.

Under ARCO's proposed construction of § 49.60.180, an employer's liability for handicap discrimination in any particular case would turn on the employer's good faith determination of whether an employee's condition constituted a handicap in light of the applicable regulations and decisional law. Needless to say, such a construction would turn the handicap discrimination law on its head as it would permit the employer to the serve as factfinder under a statute that was enacted to regulate the employer's conduct. It is the domain of the jury or judge, not the employer, to determine whether a condition constitutes a handicap. As long as the employer is on notice that an employee suffers from a serious medical condition, it may be liable under the handicap discrimination law.

**7.** We note that ARCO is correct in recognizing that § 49.60.180 "requires that the employer affirmatively assist the employee who becomes handicapped while employed." *Dean*, 104 Wash.2d at 638–39, 708 P.2d at 397–98 (employer liable for failing to make alternative job opportunities known to disabled employee and for failing to assist employee in applying for such positions). Thus, an employee's failure to formally request an accommodation—as occurred in this case—does not absolve the employer of its obligation to reasonably accommodate its employees' disabilities. *See id.*

The cost of accommodating an able handicapped worker will be considered to be an undue hardship on the conduct of the employer's business only if it is unreasonably high in view of the size of the employer's business, the value of the employee's work, whether the cost can be included in planned remodeling or maintenance, the requirements of other laws and contracts, and other appropriate considerations.

Wash.Admin.Code § 162–22–080(3). This regulation, promulgated by the Washington Human Rights Commission, the agency charged with administering Washington's employment discrimination law, is entitled to great weight. *Holland*, 90 Wash.2d at 389, 583 P.2d at 623; *Hama Hama Co. v. Shorelines Hearings Bd.*, 85 Wash.2d 441, 448, 536 P.2d 157, 161 (1975). An employer bears the burden of establishing that a proposed accommodation " 'would impose an undue hardship on the conduct of [its] business.' " *Phillips*, 111 Wash.2d at 911, 766 P.2d at 1103 (quoting Wash.Admin.Code § 162–22–080(1)); *Clarke v. Shoreline School Dist. No. 412*, 106 Wash.2d 102, 118, 720 P.2d 793, 802 (1986).

▪ The district court found that the first two proposed accommodations would have imposed an undue hardship on ARCO's ability to effectively operate its refinery. We find clear support in the record for these findings.[8] As to the option of granting a leave of absence in 1981, the district court, in its post-trial oral re-

marks, declared that such an accommodation would have been reasonable. We also find no error in this conclusion, *see supra* n. 8 (appellate court may consider oral findings as long as they are consistent with formal findings), as no evidence in the record even remotely suggests that offering Kimbro a leave of absence in 1981 would have placed an undue hardship on ARCO.

Indeed, ARCO does not take exception to this finding; instead, ARCO argues that it cannot be held liable for failing to grant a leave of absence when at the time of Kimbro's recurrence of cluster migraines in 1981, no specific treatment program was then available for Kimbro's condition. The absence of a specific treatment program, however, clearly does not preclude the imposition of liability for failing to offer a leave of absence in this case. As long as at the time of Kimbro's termination, there were "plausible reasons to believe that the handicap [could have been] accommodated" by the a leave of absence, ARCO is responsible for its failure to offer such a leave. *See Prewitt v. United States Postal Service*, 662 F.2d 292, 310 (5th Cir.1981).[9]

▪ Here, Kimbro's cluster migraine condition during the relevant period was characterized by acute periods of migraines lasting no longer than a few months, followed by long periods of relative remission in which Kimbro would only experience occasional migraines. Thus, it was clearly plausible that a leave of absence in 1981

---

8. With respect to the first proposed accommodation, the district court, in its post-trial oral remarks, found that ARCO's legitimate need to schedule all machinist projects in advance made it unreasonable to require ARCO to permit a disabled employee such as Kimbro to use unexhausted sick leave days intermittently on days or hours when his migraine condition precluded his ability to work. Though not incorporated into the formal findings, we may properly consider this district court finding since it is consistent with the court's formal findings and merely serves to supplement them. *Southern Pacific Land Co. v. United States*, 367 F.2d 161, 162 n. 1 (9th Cir.1966); C. Wright & A. Miller, *Federal Practice & Procedure*, Civil § 2580 (1971).

As to the second proposed accommodation of compensating for absent time by working after regular hours, the district court found safety

considerations counselled against regularly allowing an individual machinist to work by himself after hours.

9. *Prewitt* involved a claim brought under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, the federal counterpart to § 49.60.180 in the handicap discrimination context. The supreme court of Washington has clearly held that it is appropriate to look to federal decisions interpreting the Rehabilitation Act to determine the proper construction of the state's law prohibiting handicap discrimination. *Clarke*, 106 Wash.2d at 118, 720 P.2d at 803; *see generally Fahn v. Cowlitz County*, 93 Wash.2d 368, 376, 610 P.2d 857, 861 (1980) (when Washington statutes have the same purpose as federal counterparts, federal decisions may be instructive in construing state law).

would have provided Kimbro with an opportunity to endure the 1981 acute episode and then return to work unimpaired for the foreseeable future. Moreover, at the time of his discharge, it was also plausible that a prolonged leave from work would have given Kimbro and his physicians an opportunity to design an effective treatment program. While it is altogether possible that Kimbro's migraine episodes may have recurred upon his return to work following a leave of absence, such a possibility does not foreclose a finding of liability for failure to accommodate Kimbro's migraines in 1981. As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation. Accordingly, ARCO's failure to offer a leave of absence to Kimbro constitutes a violation of Washington's handicap discrimination law.[10]

### IV.

Kimbro's complaint also sets forth a breach of contract claim. Kimbro alleges that ARCO's Sick Leave Plan modified his employment-at-will status to the extent that the Plan constituted a binding promise that ARCO employees could not be terminated for excessive absences as a result of non-occupational illness or injury as long as the employee retained unexhausted sick leave days to cover such absences. Thus, Kimbro claims that ARCO breached its contractual obligation by terminating him for excessive absenteeism resulting from his migraine and back conditions when he still had several months of unexhausted sick leave at the time of his discharge. Kimbro also contends that ARCO's written attendance employment policy altered his terminable-at-will contract by contractually obligating ARCO to explicitly consider medical reasons underlying an employee's poor attendance before taking any disciplinary action. ARCO's failure to make such an in-

quiry and give due weight to his migraine condition prior to his termination, Kimbro argues, constituted a breach of this contractual duty.

The district court rejected Kimbro's breach of contract claim, finding that neither the Sick Leave Plan nor the written attendance policy modified or altered the parties' employment-at-will relationship. We affirm the district court's judgment on these claims.

In *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081 (1984), the Supreme Court of Washington held that a terminable-at-will employment relationship may be modified, and the employer contractually bound, by "promise *of specific treatment in specific situations*" made in employee manuals or handbooks issued by employers to their employees. *Id.* at 230, 685 P.2d at 1088 (emphasis in original). The employer will be bound, however, only by those specific promises upon which the employee justifiably relies. *Id.; Stewart v. Chevron Chemical Co.*, 111 Wash.2d 609, 762 P.2d 1143, 1146 (1988). Specifically, the employee must show that the promise induced him to remain on the job or not seek other employment. *See id.*

Kimbro's evidence at trial failed to meet this evidentiary burden. With respect to the Sick Leave Plan, Kimbro introduced no evidence that his interpretation of the Plan—an unconditional entitlement to the use of all accumulated sick leave days—actually induced him to remain as a machinist at ARCO. Thus, he failed to show the requisite degree of reliance to establish that the Plan contractually obligated ARCO to take no disciplinary action against an employee retaining sick leave days. *See Stewart*, 111 Wash.2d at 614, 762 P.2d at 1146. Moreover, even assuming Kimbro had made a sufficient showing of subjective reliance, his claim still must fail as the district court's finding demonstrates that such reliance was not objectively justified.

---

10. This is not to say that ARCO would necessarily have been obligated to grant a second leave if the migraine condition recurred after return from the initial leave. Indeed, the fact that an accommodation has been attempted and was unsuccessful is a relevant consideration for the factfinder and may in fact prove dispositive in determining whether failure to permit subsequent leave constituted failure to make a reasonable accommodation.

*See Thompson,* 102 Wash.2d at 233, 685 P.2d at 1087–88. The district court concluded, based on the testimony of several ARCO employees, that employees at the ARCO refinery were generally aware that they could be subject to discipline, including discharge, for excessive absenteeism, even if their sick pay allowance had not been exhausted. This finding is clearly supported by the record. Accordingly, under *Thompson* and its progeny, Kimbro's employment-at-will relationship was not modified by the Sick Leave Plan.

■ Kimbro's contention that ARCO's written attendance policy constitutes a binding promise also lacks merit.[11] First, it is highly questionable whether ARCO's attendance policy is the type of written policy statement that falls within the *Thompson* contract modification doctrine. The policy is neither part of an employee handbook, nor generally distributed to employees; rather, the policy is contained in a supervisor's manual for the supervisors' use in administering ARCO's personnel policy. The employees are permitted to review the supervisor's manual, however, if they request to do so.

*Thompson* and its progeny seem to contemplate that an at-will relationship is subject to modification only by policies contained in a personnel manual or, at the very least, statements of policy actually distributed to employees. *See Thompson,* 102 Wash.2d at 233, 685 P.2d at 1088 (employee manual); *Brady v. Daily World,* 105 Wash.2d 770, 772–73, 718 P.2d 785, 786 (1986) (personnel handbook distributed to employees); *Stewart,* 111 Wash.2d at 612–13, 762 P.2d at 1145 (Regulating Manual distributed to employees). We need not de-

termine the extent to which employment policies must be made available to employees in order to fall within the ambit of *Thompson,* however, since, in any case, ARCO's attendance policy does contain the specificity necessary to create a binding contract.

ARCO's attendance policy states only that "the reasons for each absence must be evaluated," and then lists specific questions that may be relevant in the evaluation of individual attendance records and to the ultimate determination of whether to take disciplinary action. The policy neither discusses how much weight should be placed on the fact that a serious illness is the underlying cause of an attendance problem nor does it provide any indication of the relative importance of the other factors. Accordingly, the policy cannot be held to modify the at-will relationship. *See Stewart,* 111 Wash.2d at 614, 762 P.2d at 1146 (where policy only requires company to consider particular factors in lay-off decisions, but assigns no relative weight or value to any of the criteria, policy lacks sufficient specificity to create a binding promise). Thus the district court properly entered judgment in favor of ARCO on the breach of contract claims.

### V.

■ Kimbro also claims that the district court erred in finding that he was not terminated in retaliation for prior use of ERISA-protected sick leave benefits in violation of ERISA. We find no error in the district court's rejection of Kimbro's ERISA claim.

Section 510 of ERISA, 29 U.S.C. § 1140, prohibits an employer from taking any adverse employment action against an employee "for exercising any right to which

---

11. The relevant section of ARCO's attendance policy states:

   It should be noted that each absence record must be evaluated on its own merit. The reasons for each absence must be evaluated. For example:
   1. Has a serious illness, major personal problem or urgent personal problem necessitated the employee to lose time from work?
   2. Is the record showing a tendency of absences on Fridays or Mondays (attempting to create long weekends)?
   3. Do the absences follow or precede scheduled or worked overtime?
   4. Are the absence dates on the same days as scheduled major sporting events or immediately prior to or following scheduled vacations or holidays?
   5. Has the employee been absent due to sickness more than five (5) days during the year?
   6. Does the absence record include any absence without leave (AWOL)?
   7. Have the absences for personal business been given prior approval by supervision?

he is entitled under the provisions of an employee benefit plan...."[12]

Generally speaking, an "[u]nlawful reprisal occurs when (1) an employee participates in a statutorily protected activity, (2) an adverse employment action is taken against him or her, and (3) a causal connection existed between the two." *McKinney v. Dole*, 765 F.2d 1129, 1143 (D.C.Cir.1985). This general reprisal standard clearly applies in the ERISA context. *See Baker v. Kaiser Aluminum & Chemical Corp.*, 608 F.Supp. 1315, 1318 (D.C.Cal.1984) ("To recover under § 1140, plaintiff must show that defendant terminated him with the 'specific intent' to interfere with his rights under defendant's benefits plans."); *Watkinson v. Great Atlantic & Pacific Tea Co., Inc.*, 585 F.Supp. 879, 882–83 (E.D. Pa.1984).

■ Thus, to establish a violation under § 1140, a plaintiff-employee must show that his prior use of sick leave benefits was the motivating force behind his discharge. Kimbro, however, failed to adduce at trial any evidence from which one could reasonably infer that his discharge was in reprisal for his prior use of sick leave benefits. While the timing of a discharge may in certain situations create the inference of reprisal, *see Hochstadt v. Worcester Foundation for Experimental Biology, Inc.*, 425 F.Supp. 318, 324 (D.Mass.1976), *aff'd* 545 F.2d 222 (1st Cir.1976) (plaintiff may establish unfair reprisal under Title VII by showing "[his] discharge followed [his] protected activities within such period of time that the court can infer retaliatory motivation"), there is nothing in the record which raises any suspicion regarding the timing of Kimbro's termination. Kimbro's back surgery, which required the continuous use of sick leave days over a sustained period occurred five years before his discharge. Moreover, his use of benefits immediately prior to his termination was not at a signifi-

cantly greater rate than his use during previous periods in which he was suffering from migraines or having difficulty with his back.[13] Accordingly, Kimbro has failed to establish a prima facie case of unfair reprisal for use of ERISA-protected benefits.

## VI.

■ Having disposed of Kimbro's claim on appeal, we next turn to ARCO's contention that the district court abused its discretion in refusing to award it attorneys' fees under ERISA, 29 U.S.C. § 1132(g). Specifically, ARCO claims that since it had already pared down its fee request to only those fees attributable to the defense of Kimbro's ERISA claim, it was improper for the district court to weigh the fact the ERISA claims were collateral to the main thrust of the lawsuit when determining the propriety of a fee award. Finding no abuse of discretion in the district court's refusal to award ARCO its ERISA-related fees, we affirm the district court order. *See Hummel v. S.E. Rykoff & Co.*, 634 F.2d 446, 452 (9th Cir.1980) (a district court's determination regarding the award of attorneys' fees under ERISA, 29 U.S.C. § 1132(g), should be reversed only for abuse of discretion).

In *Hummell, supra*, the Ninth Circuit set forth several factors that should be considered in deciding whether to award attorneys' fees under § 1132(g):

(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question re-

---

**12.** "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ... or for the purpose of interfering with the attainment of any right to which such par-

ticipant may become entitled under the plan...."
29 U.S.C. § 1140.

**13.** While Kimbro also argued at trial that he was discharged to prevent his use of company disability benefits, he has abandoned this claim on appeal.

**882**

garding ERISA; and (5) the relative merits of the parties' positions.

*Id.* at 453.

In this case, the district court applied several of the *Hummell* factors and found it inappropriate to award attorneys' fees. Specifically, it concluded that the lawsuit had not been brought in bad faith, that ARCO was clearly able to pay its own fees while Kimbro was essentially without resources, and that an assessment of attorneys' fees against Kimbro might "dissuade similarly situated plaintiffs from bringing suit." In making its decision, the court also emphasized that Kimbro's ERISA claim was collateral to the main issues of the lawsuit.

We find no error in the district court's treatment of ARCO's request for fees. The district court found the first three *Hummel* factors all counseled against awarding ARCO fees. Although the court also apparently considered the fact that the ERISA claim was a collateral issue of the lawsuit, a factor not suggested in *Hummel*, ARCO fails to provide any authority which suggests that it is impermissible to consider such a factor in making a fee award determination. Moreover, even assuming the district court should not have considered the collateral nature of the ERISA claim, its decision to deny fees still cannot be deemed an abuse of discretion since the district found that several of the *Hummell* criteria weighed against a fee award as well. Accordingly, the district court did not abuse it discretion in denying ARCO's motion for attorneys' fees under ERISA.

## VII.

The district court judgment should be affirmed with respect to Kimbro's breach of contract and ERISA claims. The district court's denial of ARCO's request for attorneys' fees should also be affirmed. However, the district court erred in finding that ARCO had not engaged in unlawful handicap discrimination. Since ARCO failed to make a reasonable accommodation to Kimbro's migraine condition, we reverse the judgment of the district court on the handicap discrimination claim and remand for a determination of damages. Plaintiff is entitled to costs.

AFFIRMED IN PART AND REVERSED IN PART.