Donald MANCINI

v.

GENERAL ELECTRIC COMPANY.

Civ. A. File No. 2:91–CV–267.

United States District Court, D. Vermont.

March 15, 1993.

Therese M. Corsones, Corsones & Corsones, Rutland, VT, for plaintiff.

Robert B. Hemley, Gravel & Shea, Burlington, VT, for defendant.

## OPINION AND ORDER

PARKER, Chief Judge.

Plaintiff Donald Mancini ("Mancini") brought this action against General Electric Company ("GE") claiming that GE violated certain contractual, tort, and statutory duties by terminating Mancini's employment. Defendant, GE, moved for summary judgment on all counts and plaintiff opposed this motion. Based on the following opinion, defendant's motion for summary judgment is GRANTED as to all counts.

## BACKGROUND

For purposes of summary judgment, the facts of this case are viewed in the light most favorable to the non-moving party, Mancini. *See Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988). Mancini began working for General Electric in 1966 and continued working there until his employment was terminated in 1990. He accepted employment with GE, in part, because of the job security it offered him. He was particularly impressed with the terms of the employee handbook which indicated to him that he would have his job as long as he continued to perform satisfactorily. (Mancini Aff. at ¶¶ 1, 2.)

Over the years at GE, Mancini had problems following certain orders of his supervisors. In particular, he at times resisted working on machines outside of his immediate work area on which he did not normally work. (*Id.* at ¶¶ 5, 6, 9.) In November of 1983, Mancini lost his temper with his supervisor and directed abusive language at him. (Pl.'s Attach. A, B, C to Pl.'s Opp'n to Summ. J.) Mancini, at that time, admitted being under a lot of stress and pressure in his personal life, and as part of his continued employment, he agreed to meet with a psychologist. *Id.* Certain employees of GE knew of this agreement and it is possible that several of Mancini's co-workers knew that he was meeting with a psychologist. (Mancini Aff. at ¶¶ 5, 13.)

When a new manager, Mr. Chicoine ("Chicoine"), was assigned to Mancini's work area, Mancini's problems at work took a turn for the worse. On the first night of Chicoine's supervision over Mancini, February 12, 1990, a disagreement occurred between the two. Chicoine asked Mancini to operate a machine in a different work area. Mancini objected, noting: "Other people were sitting on their ass."[1] (Mancini Dep. at 85.) Mancini then "got disgusted and quit." (*Id.* at 86.) He handed over his time card and left the building. (*Id.*) Afterwards, Mancini decided he wanted to come back to work and GE allowed him to do so, but defendant placed him on what it calls a "decision making leave." The decision making leave mandated that Mancini could have no further formal disciplinary problems at work or else he would be immediately terminated. (*Id.* at 90.) At this time Mancini also claims that he told Chicoine that he intended to begin treatment with his psychologist again. (Mancini Aff. at ¶ 6.)

Although there is disagreement between Mancini and Chicoine as to the following facts, Mancini claims that during the decision-making leave Chicoine conducted himself in a generally oppressive manner attempting to provoke Mancini so that Chicoine would then be able to fire him. (Mancini Aff. at ¶¶ 6, 9, 10, 13.) Chicoine treated Mancini differently from other workers in that he did not treat Mancini with the same degree of respect that he had for others. For example, at times he would not say hello to Mancini or engage in conversation with him. (*Id.* at ¶¶ 6, 9.)

The last night of Mancini's employment, September 13, 1990, was similar in many respects to the first night Chicoine supervised him. Chicoine told Mancini that there was work in another area of the plant called the A & B team. Mancini initially refused to work in the A & B area. Mancini has offered three different reasons for not wanting to work in the A & B area: another employee had no work and he felt because he was the senior employee, the other should have to go to work in the other area; he was ill and wanted to go home; and he did not know how to operate the machine in the other work area. (Mancini Dep. at 94–100; Mancini Aff. at ¶ 9.) During this discussion, which apparently became quite heated, Mancini claims that Chicoine said, "Get your ass up there or you'll be pumping hamburgers at McDonald's." (Def.'s Attach. B to Mot. for Summ.J.) Because Mancini did not want to work in the other area, Chicoine sent Mancini home after explaining to Mancini that he risked losing his job if he did not go to work in the A & B area. (Mancini Dep. at 99.)

---

[1]. Plaintiff's account of this event changes from affidavit to deposition, and within the deposition itself. Under these circumstances it is proper to disregard the affidavit and hold plaintiff to the deposition testimony. *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987).

On his way out, Mancini ran into another manager at GE. Upon discussing the situation with that manager, Mancini changed his mind; and decided that he wanted to stay and work in the A & B area. He went back to Chicoine and told him of his decision. After initially refusing to allow him to work, Chicoine agreed to permit Mancini to stay for the night, but informed him that he would go over the whole situation with the plant manager the next morning. Mancini went to work in the other work area.

Later that same night, Chicoine approached Mancini to inform him of his intention to tell the plant manager of that night's earlier happenings. Chicoine claims that he did this in order to clarify Mancini's situation; he did not want Mancini to think that because he was allowed to return to work, no action would be taken. Mancini claims that he had already been told this by Chicoine earlier, and that Chicoine's only intention was to further harass and provoke him. Both agree that Mancini lost his temper. (Mancini Aff. at ¶ 10.)

As a result of these incidents, Mancini's employment was terminated. In accordance with procedures outlined in a GE Handbook,[2] Mancini appealed this determination. At both levels of appeal, the original decision to terminate was upheld, but the appeal procedure took much longer then the employee manual mandates. Plaintiff claims that the length of the review represents a breach of contract and further compounded his emotional distress.

## DISCUSSION

### I. Standard of Review

██ Summary judgment will be granted when there is no genuine issue of material fact and when, based upon the facts not in dispute, the moving party is entitled to judgment as a matter of law. *Litton Indus. v. Lehman Bros. Kuhn Loeb, Inc.*, 967 F.2d 742, 746 (2d Cir.1992) (citing *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). A dispute regarding a material fact is genuine if the evidence indicates that a reasonable jury could return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, judgment will be entered against a non-moving party who fails to make a showing sufficient to establish an element essential to that party's case on which that party bears the burden of proof at trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552.

### II. Contract Claim Based on the Employee Handbook

██ Plaintiff claims that GE's employee manual represents a contract between Mancini and the defendant and that the defendant breached this agreement. The defendant has moved for summary judgment on the grounds that Mancini was an at-will employee who could be fired for no reason or for any reason. In Vermont, an employment contract for an indefinite term is presumed to be an at-will agreement. *Foote v. Simmonds Precision Products Co.*, —— Vt. ——, ——, 613 A.2d 1277, 1279 (1992). But this is a only a presumption, and like all presumptions may be overcome by evidence to the contrary. *Sherman v. Rutland Hospital*, 146 Vt. 204, 207, 500 A.2d 230, 232 (1985); *Foote*, 613 A.2d at 1279. In Vermont, an employee must show that he or she and the employer bargained for and agreed to make the terms of the employee manual a part of the employment agreement. *Larose v. Agway, Inc.*, 147 Vt. 1, 3, 508 A.2d 1364 (1986); *Moss v. Mutual of Omaha Ins.*, No. 89–138, slip op. at 7, 1990 WL 485666 (D.Vt. April 9, 1990). Thus, if the employer unilaterally adopts, enforces, implements, and amends the employment manual, and the parties do not negotiate over the terms of the manual, either at the time of hiring or during the amendment of the manual, then the at-will

**2.** In GE's most recent submission, defendant argues that the appeal procedure mandated by the employee termination handbook did not apply to Mancini's termination. (Def.'s Supplemental Mot. for Summ.J. at 15–16). The handbook appears to be somewhat ambiguous on this point, but an inference can be drawn in favor of Mancini, the non-moving party, that the handbook does require such a procedure. (*See* GE Employee Handbook 57–59 Attach. to Def.'s Supplemental Memo. in Supp. of Mot. for Summ.J.).

agreement has not been modified by the terms of the employee handbook and plaintiff cannot prevail. *Id.* In other words, under *Sherman,* there must be a bilateral modification of the at-will agreement. *See Foote,* 613 A.2d at 1279; *see also Moss,* slip op. at 7; *Benoir v. Ethan Allen, Inc.,* 147 Vt. 268, 271 n. 2, 514 A.2d 716, 718 n. 2 (1986).

In the instant action, the only evidence Mancini has proffered to overcome the presumption that the agreement was at-will is the existence of the handbook itself, and an affidavit by Mancini which states: "I wanted to work for G.E. because I understood there was job security; I understood that if you did your job, then you could work there throughout your career. I was given a handbook during the interview that showed the rules. It was my understanding that you could not be fired unless there was good reason to fire you." (Mancini Aff. at ¶ 1).

The case at bar is distinguishable from *Sherman* because Mancini presents no evidence that he manifested his intent to follow the rules in the employee handbook as a condition of his employment. The facts do not indicate that defendant made sure that Mancini had read and understood the manual; Mancini did not sign a card to this effect, nor did he sign the manual. Such facts were significant in cases finding that there had been a modification of the at-will agreement. *Sherman,* 146 Vt. at 205–06, 500 A.2d at 231; *see also Benoir,* 147 Vt. at 271 n. 2, 514 A.2d at 718 n. 2. Thus, in a bilateral modification context, Mancini's internal reactions to the employee manual, standing alone, is not enough to modify the terms of the at-will agreement under Vermont law. *See Moss,* slip op. at 7–8. Upon these facts, no reasonable jury could find that "the terms of the personnel manual were bargained for by the parties, and that the parties agreed to make those terms a part of the plaintiff's employ-

ment agreement." *Larose v. Agway, Inc.,* 147 Vt. 1, 3, 508 A.2d 1364, 1366 (1986) (citing *Sherman,* 146 Vt. at 208, 500 A.2d at 233).

Recently, in dicta, the Vermont Supreme Court stated, "[a] number of courts have held that an employer may unilaterally modify an at will contract, by publishing a company handbook or manual on which it intends employees to rely." *Foote,* 613 A.2d at 1279–80 (citations omitted). But, in *Foote,* the court did not agree or disagree with this so-called unilateral rule, and previously, in *Larose,* the court held that an employee manual alone is not enough to overcome the at-will presumption. *See Larose,* 147 Vt. at 3, 508 A.2d at 1366. The court in *Foote* never mentioned *Larose* (in this regard) and there was no indication that the court in *Foote* intended to overrule *Larose.*[3] Based on this one statement in dicta, this Court is unable to predict that the Vermont Supreme Court would find that the employment manual, standing alone, was enough to create a unilateral contract under the facts in this case.[4] *Chandler v. Bombardier Capital, Inc.,* No. 90–64, slip op. at 9, n. 6 (D.Vt. Sept. 10, 1992) (Niedermeier, Mag.J.) (Report and Recommendation), *adopted,* No. 90–64, 1992 WL 474798 (D.Vt. Oct. 8, 1992) (Coffrin, J.). Thus, we follow the holding in *Larose.* Accordingly, defendant's motion for summary judgement as to Count I is granted.

### III. Handicap Discrimination Claim

In Count II of his complaint, Mancini claims that Defendant's actions constituted discrimination against a qualified handicapped individual under the Vermont Fair Employment Practices Act ("FEPA"), 21 V.S.A. §§ 495–495e (1987 & Supp.1992). Defendant moves for summary judgment on three grounds: (1) Mancini has failed to meet the definition of a "qualified handicapped in-

---

3. In fact the case was cited with approval in connection with a promissory estoppel analysis.

4. Even if the Vermont Supreme Court were to adopt the unilateral contract theory in this case, it is questionable whether the theory would apply here. In recognizing that this rule existed in other jurisdictions, the court cited *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 229–30, 685 P.2d 1081, 1087–88 (1984). In *Thompson,*

the Washington Supreme Court stated that employers could avoid the result of the unilateral rule by stating clearly in the employee handbook that the handbook is not intended to create a contract between the employer and the employee. In the case at bar, defendant did place such a statement in its handbook, and it is therefore unlikely that the Vermont Supreme Court would apply the unilateral rule to the case at bar.

dividual" under 21 V.S.A. § 495d(6); (2) even if Mancini is considered a "qualified handicapped individual," it was impossible for GE to make a "reasonable accommodation" of plaintiff's handicap under 21 V.S.A. § 495d(12); and (3) GE did not know that Mancini was handicapped and therefore could not have had the necessary discriminatory motive when it discharged him.

FEPA mandates, in part, that "[i]t shall be an unlawful employment practice ... [f]or any employer ... to discriminate ... against a qualified handicapped individual." 21 V.S.A. § 495(a)(1) (Supp.1992). Under FEPA any person who is aggrieved by its violation may bring a private cause of action for damages or equitable relief. 21 V.S.A. § 495b(b).

The subchapter encompassing § 495 is patterned on Title VII of The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the standards and burdens of proof under state law are identical to those existing under federal law. *Sprague v. University of Vermont,* 661 F.Supp. 1132, 1140 (D.Vt.1987); *Cobb v. Dufresne–Henry, Inc.,* 603 F.Supp. 1048 (D.Vt.1985). The portions of FEPA which relate to discrimination against the handicapped are largely patterned after § 504 of the Rehabilitation Act of 1973 and the regulations promulgated under that Act. *Compare* 21 V.S.A. §§ 495(a), 495d *with* the Rehabilitation Act of 1973, § 504, as amended, 29 U.S.C. § 794 (Supp.1992) *and* Prohibition Against Discrimination Because of a Physical or Mental Handicap, 29 C.F.R. §§ 1613.702, 1613.704 (1992). Also, the Vermont Supreme Court has relied on federal law arising under section 504 of the Rehabilitation Act to interpret FEPA. *See Packard v. Gordon,* 148 Vt. 579, 583, 537 A.2d 140, 142–43 (1987). In addition, the Second Circuit looks to Title

VII analysis when adjudicating suits brought under § 504 of the Rehabilitation Act of 1973. *See Fleming v. New York University,* 865 F.2d 478, 482 (2d Cir.1989); *Doe v. New York University,* 666 F.2d 761 (2d Cir.1981) (burden shifting under Title VII proper in handicap discrimination case when the "defendant disclaims any reliance on the handicap."). Thus, it is appropriate to look to federal law arising under both Title VII, 42 U.S.C. § 2000e, and § 504 of the Rehabilitation Act of 1973, as amended, at 29 U.S.C. § 794, in interpreting the provisions of FEPA concerning discrimination against handicapped individuals. *Hodgdon v. Mt. Mansfield Co.,* — Vt. —, 624 A.2d 1122 (1992) (final decision subject to motion for reargument which is pending).

In the typical handicap discrimination case, the defendant-employer will usually acknowledge that they relied on the plaintiff's handicap in their decision-making process. In this type of case, the focus is on whether the plaintiff is a handicapped individual, whether plaintiff was capable of performing the essential functions of his or her job, and whether the plaintiff's handicap could be reasonably accommodated. *Doe,* 666 F.2d at 776; *see also Smith v. Barton,* 914 F.2d 1330, 1339 (9th Cir.1990). In some cases, however, the defendant will disclaim any reliance on the plaintiff's handicap and then the burden-shifting analysis under Title VII is applicable. *Doe,* 666 F.2d at 776.

The case at bar has been argued in a hybrid fashion, and is not easily defined as a typical handicap discrimination claim or as one that requires a Title VII burden shifting analysis. GE claims that there was no reliance on Mancini's handicap when it made the decision to terminate his employment,[5] but at

---

5. Whether GE has disavowed reliance on the plaintiff's handicap in this case is uncertain. Defendant admits that it terminated Mancini's employment because he was insubordinate. Defendant contends, however, that because they did not know that plaintiff actually suffered from a "handicap" within the meaning of FEPA, it cannot be held liable even if it is held to have notice of plaintiff's emotional problems. A similar argument was rejected in *Kimbro v. Atlantic Richfield Co.,* 889 F.2d 869, 877 n. 6 (9th Cir.1989). There the court reasoned that acceptance of this

argument would give the employer the right to determine whether the employee's condition amounted to a handicap under the applicable law. *Id.* It stated that "[s]uch a construction would turn the handicap discrimination law on its head as it would permit the employer to serve as fact finder under a statute that was enacted to regulate the employer's conduct." *Id.* The determinative issue in such cases is whether the employer had notice of the plaintiff's physical or mental condition, not whether the employer knew plaintiff was handicapped.

the same time defendant focuses the case on plaintiff's handicap by contending that plaintiff was not a "qualified handicapped individual" and that even if he was, there was no way to reasonably accommodate his handicap. Because we find that plaintiff was not a qualified handicapped individual who could be reasonably accommodated, there is no need to consider whether plaintiff's termination was caused by an improper motive on the part of the defendant. This case is therefore best treated as a traditional handicap discrimination claim where there is no need to apply the burden shifting analysis borrowed from Title VII.

In this type of case "the plaintiff may make out a prima facie case by showing that he is a handicapped person under the Act and that, although he is qualified apart from his handicap, he was denied ... employment because of his handicap. The burden then shifts to the ... employer to rebut the inference that the handicap was improperly taken into account." *Id.*

For purposes of the summary judgment motion only, defendant concedes that Mancini is a "handicapped individual" within the meaning of 21 V.S.A. § 495d(5). Thus, we must determine whether Mancini was capable of performing the essential functions of his job despite his handicap with a reasonable accommodation from his employer. Plaintiff has the burden of persuasion on this issue, but we are presented with a motion for summary judgment. Plaintiff, therefore, does not have to demonstrate each element of his prima facie case by a preponderance of the evidence. Rather, he must show that material factual disputes exist as to each element of his claim. *Clark v. Metropolitan Life Insurance*, No. 88–95, slip op. at 19 (D.Vt. May 3, 1990).

Mancini claims that he has "an emotional condition that is characterized by feelings of inferiority and unacceptability" which led defendant to terminate him. The defendant contends that Mancini's emotional problems lead to insubordination, which means that Mancini cannot perform the essential functions of his job. Plaintiff must be able to perform the essential functions of the job in spite of his handicap. 21 V.S.A. § 495d(6);

*see also Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979) ("[a]n otherwise qualified person is one who is able to meet all of the program's requirements in spite of his handicap.").

Several courts have held that the ability to follow the orders of superiors is an essential function of any position. In other words, employees who are insubordinate are not otherwise qualified for the position. *Dowden v. Tisch*, 729 F.Supp. 1137, 1138–39 (E.D.Tex.1989); *see also Severino v. North Ft. Myers Fire Control Dist.*, 935 F.2d 1179, 1183 (11th Cir.1991) (the Rehabilitation Act "does not subject employers to liability for maintaining appropriate discipline in the workplace."); *Leckelt v. Board of Commissioners*, 714 F.Supp. 1377, 1387 (E.D.La. 1989) (nurse who refused to follow hospital infection control policy was not otherwise qualified), *aff'd*, 909 F.2d 820 (5th Cir.1990); *Thomas v. General Services Admin.*, No. 86–0941, 1989 WL 200665, at *7 (D.D.C. May 17, 1989) (employee who was insubordinate held not otherwise qualified). In addition, courts have found that plaintiffs must be on-time and at work in order to perform the essential functions of their jobs. *Matzo v. Postmaster General*, 685 F.Supp. 260 (D.D.C.1987); *Wimbley v. Bolger*, 642 F.Supp. 481, 485 (W.D.Tenn.1986). Thus, employees must be present and willing to obey their supervisors to perform the essential functions of their job.

■ Mancini does not appear to contest this conclusion of law, but rather argues that there is not enough uncontested summary judgment evidence to find that he was insubordinate. As the facts indicate above, even when viewed in the light most favorable to plaintiff, Mancini was insubordinate on several occasions with different supervisors. Mancini admits that he "lost his temper" with his supervisors, and instead of going to work as assigned, he requested to go home and threatened to leave work. Insubordination is defined as a refusal to follow the orders of superiors, and therefore, the uncontested facts indicate there are several occasions where Mancini was insubordinate.

Next, Mancini argues that if defendant had reasonably accommodated his handicap he would have been able to perform the essential functions of his job. Mancini claims that he requested to "bid out" of his work area so that he could be removed from the real source of his problem, his supervisor Gary Chicoine, but that GE refused to make this accommodation.

Employers must reasonably accommodate their employee's handicaps under FEPA. 21 V.S.A. § 495d(6). A "reasonable accommodation" is defined as "the changes and modifications which can be made in the structure of a job or in the manner in which a job is performed unless it would impose an undue hardship on the employer." 21 V.S.A. § 495d(12). Furthermore, a "[r]easonable accommodation may include ... job restructuring." 21 V.S.A. § 495d(12)(B).

■ Unfortunately for plaintiff's contention, other courts have held that transferring a handicapped individual solely to allow the employee to work under a different supervisor is "not [an accommodation] reasonably to be expected." *Adams v. Alderson*, 723 F.Supp. 1531, 1532 (D.D.C.1989); *cf. Dowden*, 729 F.Supp. at 1138 (employee who requested as an accommodation " 'work ... restricted to his regularly scheduled assignment' " could not be reasonably accommodated and is not otherwise qualified). In *Adams*, the employee claimed to have a mental impairment which was only triggered by his supervisor at work. *Adams*, 723 F.Supp. at 1531. Adams proposed that they transfer him to another work area so that he and the supervisor would be at a distance. *Id.* at 1352. The court reasoned that although "such a course would surely be an accommodation to plaintiff, it clearly is not one reasonably to be expected of" the employer. *Id.* at 1532. Employers are entitled to assign personnel as their needs dictate. *Id.* In the instant case, GE was therefore under no obligation to transfer Mancini to avoid further insubordination problems on the part of its employee.

Because plaintiff's insubordination cannot be cured through a reasonable accommodation, plaintiff cannot be considered a qualified handicapped individual under FEPA. Because plaintiff has failed to meet his burden of proof on this element, we need not further consider whether Mancini was discharged because of his handicap. Accordingly, defendant's motion for summary judgment as to Count II is granted.

## IV. Intentional Infliction of Emotional Distress

■ Mancini also alleges that defendant's conduct in terminating Mancini constituted intentional infliction of emotional distress. Under Vermont law, the plaintiff must demonstrate four elements to make a prima facie case of intentional infliction of emotional distress: (1) there must be outrageous conduct; (2) this conduct must be done intentionally or with reckless disregard of the probability of causing emotional distress; (3) the conduct must result in the suffering of extreme emotional distress; (4) the extreme emotional distress must be actually or proximately caused by the outrageous conduct. *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296, 576 A.2d 441, 448 (1990) (citations omitted); *Sheltra v. Smith*, 136 Vt. 472, 476, 392 A.2d 431, 433 (1978) (adopting intentional infliction of emotional distress from the Restatement (Second) of Torts § 46 (1965)). Defendant concedes, for the purposes of this summary judgment motion, that the last two elements involve disputed questions of fact, but contends that, even when viewing the facts in a light most favorable to plaintiff, the material facts do not support the first two elements.

On the first element, outrageous conduct is defined by the Restatement as follows:

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arise his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 comment d (1965); *see also Jobin v. McQuillen*, —— Vt. ——, ——, 609 A.2d 990, 993 (1992)

(citations omitted) (for conduct to be considered outrageous it must be so extreme "as to 'go beyond all possible bounds of decency.'").

■ Mere termination of employment, without more, does not support a claim for intentional infliction of emotional distress. *Crump*, 154 Vt. at 296, 576 A.2d at 448. Even so, there may be grounds for this claim "where the manner of the termination evinces circumstances of oppressive conduct and abuse of a position of authority vis-a-vis plaintiff." *Id.* Nevertheless, the definition of outrageous conduct "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." *Ploof v. Brooks Drugs, Inc.*, No. 89–270, slip op. at 13–14, 1991 WL 497170 (D.Vt. Aug. 28, 1991) (citing Restatement (Second) of Torts § 46 comment d (1965)).

The actor's knowledge that another is particularly susceptible to emotional distress somewhat alters the above standards. According to the Restatement:

> The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some ... mental condition. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.

Restatement (Second) of Torts § 46 comment f (1965).

For purposes of this summary judgment motion, defendant's employee, Gary Chicoine, knew that Mancini suffered from emotional conditions which may make him more susceptible to emotional distress. During Mr. Chicoine's first night as Mancini's supervisor a dispute arose between the two. At this time, Mancini, in his affidavit, claims that he told Mr. Chicoine that he was having emotional problems and was going to resume visits with a psychologist. (Mancini Aff. at ¶ 6; *see also* Mancini Dep. at 87). Thus, for purposes of this motion, we must assume that the defendant had notice of Mancini's emotional problems.

In *Crump*, the court held that plaintiff produced sufficient evidence of intentional infliction of emotional distress where the employer's representative "summoned plaintiff to a lengthy meeting without notice, continued the meeting without a break for rest or food, repeatedly badgered him to amend and sign a statement," and where "plaintiff did not feel free to leave the meeting." In addition, "[i]mmediately after the meeting" the employer's representative told plaintiff "to clean out his desk," summarily firing plaintiff after eighteen years of service. *Id.* at 296–97, 576 A.2d at 448.

■ On the other hand, termination of employment by a supervisor who directs offensive and abusive language at the employee does not rise to the level of extreme and outrageous conduct required under Vermont law. *Ploof*, slip op. at 14. In addition, a supervisor who follows the employee and checks the employee's work in "nitpicking detail" is not enough to support the outrageous conduct element. *Snyder v. J.M. Ney Co.*, No. H–85–653, 1987 WL 14970, at *3, 1987 U.S.Dist. LEXIS 15147, at *10 (D.Conn. Mar. 25, 1987).

■ The facts in this case, even when viewed in a light most favorable to Mancini, do not indicate that a reasonable jury could find the defendant's conduct to be outrageous. Although, like the plaintiff in *Crump*, Mancini had worked for his employer for a long period of time when he was terminated, his termination did not include other factors present in that case. The employee in *Crump* was summoned without notice to a room and held for three hours, while the employer badgered him into signing a statement admitting theft. *Crump*, 154 Vt. at 296–97, 576 A.2d at 448. Mancini instead endured "mere insults and indignities" more akin to those of the type in *Ploof*, slip op. at 14–15. Mancini's supervisor directed verbal abuse at him,[6] and at times he ignored Mancini and then at other times paid unusually close attention to his work habits. Even assuming that Mancini's emotional disposition made him somewhat more susceptible to

---

**6.** For example, on the night leading up to Mancini's termination, his supervisor threatened, "Get your ass up there, or you'll be pumping hamburgers at McDonald's." (Def.'s Summ.J.Ex.B).

the adverse effects of such conduct, the conduct was not so extreme that it goes beyond all possible bounds of decency.

Defendant's summary judgment motion as to Count III is therefore granted.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is GRANTED. The Clerk of Court shall enter judgment for the defendant.