John F. PHELPS, Plaintiff,

v.

FIELD REAL ESTATE COMPANY, Bank Western, Western Capital Investment Corporation, W. Douglas Poole, Norman Marsh, one or more John Coe, Defendants.

Civ. A. No. 89-M-2019.

United States District Court, D. Colorado.

Dec. 31, 1991.

---

Susan T. Smith, Christopher N. Mammel, Pryor, Carney & Johnson, P.C., Englewood, Colo., for plaintiff.

Robert E. Benson, Jeffre T. Johnson, Sandra R. Goldman, Holland & Hart, Denver, Colo., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

MATSCH, District Judge.

The plaintiff, John F. Phelps ("Phelps"), was born and raised in a politically and socially prominent family in Pueblo, Colorado. He obtained Bachelor of Science and Master of Business Administration degrees from Arizona State University. From 1972 through 1974 he served in the United States Army, including service in Viet Nam with a military assistance command team. Phelps was a real estate salesman in Pueblo after returning from military service. In 1979 he began work with Fuller & Company in Denver, selling commercial real estate, including undeveloped land. He obtained his real estate broker's license in 1983. Phelps was successful in real estate sales but wanted to move to a management position. In 1984 he interviewed with Ray Stanley ("Stanley"), then president of Field Real Estate Company ("Field"). Western Capital Investment Corporation (WCIC) was incorporated in December, 1984 as a publicly held unitary savings and loan holding company to own and operate the following subsidiary corporations: Bank Western, a federal savings bank; Field Real Estate Company; Field Mortgage Company; Institutional Investors Corp. and West-

ern Insurance Service, Inc. Before the formation of WCIC, Midland/Western Federal Savings was an operating financial institution and the owner of Field. Field, a Colorado corporation, is a full-service real estate brokerage firm, offering commercial and residential real estate services, including sales, leasing, management, and maintenance of properties in Colorado. W. Douglas Poole became chairman of the board and chief executive officer of Field in November, 1984. After his interview with Stanley, the plaintiff wrote a letter, dated December 17, 1984, setting forth his view of the position to which he aspired. Included with that letter were budget projections for Field to operate as a third party commercial sales and leasing brokerage. The principal business of Field had been service to Bank Western and its predecessor, Midland/Western Federal Savings. A letter, dated January 9, 1985, signed by Stanley and Phelps set forth the mutual understanding of the terms and conditions under which Phelps joined the Field organization as vice president of the commercial real estate division. That letter specifically provided that it was not to be considered as a contract. The letter set out a compensation package of $60,000 per year plus 3½% of net commissions generated by the division, with a guarantee of $82,000 during the first two years. The letter did not include any description of the duties of the position. (Plaintiff's Exhibit 5). Phelps was also interviewed by Poole and by Junius Baxter, the chief executive officer and chairman of Bank Western and WCIC.

The plaintiff began his work at Field in February, 1985. At that time, a job specification and description was created for the commercial real estate division manager. (Plaintiff's Exhibit 7) Generally speaking, the position was described as managing the operation of the division and did not call for any direct selling. That was consistent with the plaintiff's wishes. Poole told Phelps that his budget projections were too low and Poole provided substantially higher budget projections. When Phelps said these were unrealistic and too optimistic, Poole said that Phelps had no idea of the volume that would be generated by Bank

Western. Based on his prior experience, Phelps was working on the premise that when Field was fully operational, each sales agent would be expected to generate $2 million in sales per year; but Poole said he expected $8 million per agent in each year.

Phelps had been successful in real estate sales by being active in the community and "networking" with others. Poole's business background was in retail sales. He had long experience with Allied Department Stores and was president of Denver Dry Goods Company for seven years before coming to Field in November, 1984. Poole had no experience in the real estate business. He believed in "cold calling," to initiate sales. Despite these differences, the two men got along well and in Poole's opinion, Phelps did a "good job" in 1986 and in 1987.

The commercial real estate division was divided into two parts, a commercial sales division and a commercial leasing division. Phelps was manager of the commercial sales division and Stanley was the manager of the commercial leasing division. Phelps reported directly to Poole.

In November, 1986, Phelps learned that he had tested positive for the Human Immuno–Deficiency Virus (HIV), the virus which causes the disease Acquired Immuno–Deficiency Syndrome (AIDS). Blood tests confirmed Phelps' suspicion that he was HIV-positive based on a probable period of exposure between 1981 and 1983. Phelps was not ill, had no symptoms of disease and his condition did not interfere with his ability to perform his job. Phelps kept the fact that he was HIV-positive secret and did not disclose his medical condition to anyone, including friends, co-employees and anyone in management at Field.

By letter dated January 22, 1987, Poole verified the understanding of the employment arrangement for Phelps by extending the employment letter of January 9, 1985 with the same compensation provisions and company benefits, except that Phelps was to be granted listing agreements. Specifically, the property known as the "Midland

Building" was given to him for listing for Field beginning January, 1987. Additional listing assignments were to be selected by Poole. Phelps indicated his agreement with this arrangement by his signature, dated January 28, 1987.

On May 8, 1987, Phelps and Norman R. Marsh ("Marsh") were made senior vice presidents of Field. Marsh was the manager of accounting, administration and personnel at Field. He was, essentially, an executive officer serving Poole. Marsh's background was in accounting. Phelps was pleased with this recognition of his performance as well as the performance review reports given to him. The practice at Field was to make an annual written performance review on a printed form with evaluations in prescribed areas of performance on a numerical rating of 5 through 1, with 5 being for outstanding performance. Poole wrote the performance reviews and gave Phelps mostly 3's for the 1986 evaluation. The only written comment under "areas for growth" was "needs to take a more hands-on approach to job." (Plaintiff's Exhibit 6).

In the annual review for the calendar year 1987, Phelps was given mostly 4's. Under areas for growth, Poole wrote "more personal involvement in development of third party business" and "reduce amount of time devoted to outside activities in order to fully concentrate on development of commercial sales division." (Plaintiff's Exhibit 18) The comment about time devoted to outside activities reflected the disagreement between the men concerning the importance of such activities in generating sales. Poole was jealous of time away from the office. Yet, Poole and Phelps continued to have a good working relationship. Phelps had developed several big real estate transactions for Field. Things changed in March, 1988, when Poole found an anonymous note on his desk, which read as follows:

Mr. Poole:

Some of us overheard a telephone conversation John Phelps was having with his doctor. There's no doubt that [he] has a fatal blood desease [sic]. We feel uncomfortable working around him.

A couple of the agents and many of the staff, especially the mothers, agree with us. Can you do something like transfer him. We sent him a letter, but there has been no action. Something *must* be done!

Members of the Staff

(Plaintiff's Exhibit 20)

Poole's reaction to this note was anger that someone had been able to enter his locked office and place the note on his desk; irritation that the note was not signed; a concern with possible effects on the company and concern for Phelps' condition. Poole showed the note to Marsh and they both speculated about the source of the note but did not form any opinions about the disease.

A day or two after receiving the anonymous note, Poole showed it to Phelps and asked if he wanted to say anything. Phelps and Poole had somewhat different recollections of this conversation. Poole testified that Phelps said that some blood tests were made but he had not received the results and that Poole asked for a letter from the doctor when the results were known. Phelps testified that he told Poole that apparently someone had overheard him talking to his doctor about recent blood tests. Phelps said that the note was true; that he had known of his condition for some time but had kept it secret and that he was concerned about his job and keeping his insurance. Phelps also testified that Poole said that he was extremely sorry to hear about Phelps' condition; he assured Phelps that the matter would be kept in absolute confidence and that so long as he was at Field, Phelps had nothing to worry about. Poole asked Phelps if he knew who may have sent the note and when Phelps said he didn't, Poole said that was the end of the matter. The court accepts Phelps' testimony concerning this meeting.

Poole was concerned about Phelps' condition as it might affect the business. The board of directors held a meeting on May 3, 1988, at which Plaintiff's Exhibit 20 was

discussed. Phelps attended that meeting for a short time to discuss the productivity of his division. During the meeting, Baxter directed Poole to get more information about Phelps' condition.

Phelps and Poole met on May 24, 1988. At that time, Poole said that he wanted to talk more about Phelps' condition because he was concerned about possible corporate liability. According to Phelps' testimony, Poole then said that there was a possible purchase of Field and that it would involve key man insurance with the buying group which would involve Phelps. Poole asked Phelps if he could get a doctor's letter about his insurability and the safety of co-workers. Poole asked if Phelps could tell him anything about his condition and Phelps responded that it involved a dormancy period of 8–10 years, that when the disease was active there would be 2 or 3 years of productivity and then death. Phelps spoke of the disease as "diminished lymphoma." Phelps created that phrase. It has no medical meaning. Phelps' impression was that Poole did not understand what was being said but Poole was too uncomfortable to ask questions. Poole said that he would also have to talk to Baxter about corporate liability and to Marsh and something would have to go in the personnel file.

In June, 1988, the plaintiff went to Dr. Clark M. Kerr, M.D. The plaintiff told Dr. Kerr that because of an effort to buy the company there was a probability that Phelps would need a physical examination for key man insurance. Phelps disclosed his medical condition to Dr. Kerr, who also reviewed blood tests. Phelps asked for a letter from Dr. Kerr. He asked Phelps to prepare a draft. Phelps prepared the draft letter, after talking to a friend who is a lawyer and another friend who is a "court administrator." Dr. Kerr made some changes in the draft. The letter was very carefully constructed to conceal more than it revealed. It read as follows:

This is in response to your request for a letter from me describing the current state of your health and assessing your possible insurability in light of the results of some blood tests about which I am aware.

At the current time you are able to perform all the duties of your present occupation.

As we have discussed, however, tests sometimes reveal the presence of substances in the body of an otherwise healthy individual that can affect the degree of medical risk which that individual faces and, hence, that can influence that individual's insurability. For example, blood tests can be performed to determine the level of dioxin ("Agent Orange"), which is sometimes found in the bodies of persons exposed to this chemical while in the armed forces in southeast Asia in the 1960's and 1970's. The presence of this substance can be an indicator of the individual's long-term health risks, and can therefore affect his or her insurability.

The tests for which I am aware of in your case indicate that, although currently able to perform all the duties of your occupation, owing to your past exposure to potentially injurious agents, you are at increased risk for certain types of cancers and other conditions. It is my opinion that the agents detected by the tests' which I am aware of are likely to be discovered in the course of the routine tests that are generally administered to determine an individual's insurability, and that it is highly likely that an insurer would decline to issue a policy to you on this basis.

Again, I would wish to emphasize that, from a medical standpoint, you are presently able to satisfactorily perform all of the duties of your current position, and that your condition does not pose any health threat to anyone whom you may encounter in the workplace.

(Plaintiff's Exhibit 24)

Phelps delivered the doctor's letter to Poole by putting it in an envelope and placing it on Poole's desk. Several days later, Phelps asked Poole if he had received Dr. Kerr's letter. When Poole said he had received it, Phelps asked if the letter was satisfactory. Poole replied that he was

completely satisfied that he was capable of doing his job. Poole did not ask for any additional information.

On July 10, 1988, a classified ad appeared in the Denver Post Sunday Edition for a "real estate commercial division mgr." giving a box number at the Denver Post for a response. Marsh placed that ad at Poole's direction. The ad appeared to be descriptive of the position which Phelps occupied although it could have referred to Stanley's position because it did not separate sales and leasing.

On July 12, 1988, Poole received a second anonymous note with a copy of the July 10 ad taped to it. The note said:

Mr. Poole:

Thanks, we knew you'd see it our way. We're very pleased!

GOD bless you!

(Plaintiff's Exhibit 25)

Phelps also received a copy of the ad taped to a note which read as follows:

You and your sickness is [sic] out of here! Take a look. Thank God that there are Christians among us who know how to take care of the likes of you. Pack your bags sucker, you're history!!!

(Plaintiff's Exhibit 26)

Poole and Phelps had a meeting on July 22. Poole was visibly angry about the performance of Phelps' division and, in defending himself, Phelps referred to the newspaper ad and asked about it. Poole replied that it had nothing to do with Phelps. On the following Monday, July 25, Phelps learned that some of the sales agents working for him had become upset about the ad. Phelps then called Baxter's office to request an appointment. Baxter, in turn, called Poole to find out what Phelps wanted. Poole became angry that Phelps was trying to see Baxter. As a result, Poole confronted Phelps to ask why he wanted to see Baxter. Phelps replied that he wanted to talk about the effects of the newspaper ad. Poole expressed his anger to Phelps and said that going to Baxter showed no trust. Phelps testified that at this time Poole tried to get him to resign. When Phelps refused, Poole's tone changed to one of support and when Phelps then re-

quested that Poole talk to the agents, Poole agreed.

At a meeting with the managers the next day, Poole explained that he was considering a new division to handle REO properties. REO properties were those which Bank Western had acquired when loans went into default. On the following day, Poole also talked to the real estate agents and encouraged them to work harder. When an agent asked Poole why he had called the meeting, Poole said that some people thought Phelps' job was in jeopardy, but it wasn't.

Another ad appeared in the Sunday edition of the Denver Post the next Sunday, July 31, 1988. That ad was for a division manager for real estate commercial leasing. A copy of it was taped to an anonymous note sent to the plaintiff, with the note reading:

Third time is a charm. Start counting your severance pay!

(Plaintiff's Exhibit 28)

Although this ad referred to leasing, Phelps thought that it was his job being advertised and that leasing was used to throw him off. Nonetheless, Phelps did not confront Poole about this ad and did not show Poole the note. The effect of the ad, however, was further damage to Poole's credibility with Phelps and with the agents.

Poole denied placing this ad. The newspaper records reflected a call by Norman Marsh. He also denied placing the ad. A copy was attached to a third anonymous note to Poole, reading:

We want Phelps out of here—not Stanley. When can we see some results? Three ads is fine, but we want a change!

(Plaintiff's Exhibit 27)

One of the members of the board of directors of Bank Western was Dr. Paul Hamilton, Jr., a physician who was practicing internal medicine, primarily hematology and oncology. Poole told Dr. Hamilton about the fatal blood disease statement in the anonymous note and they discussed possibilities in terms of communicable diseases. Dr. Hamilton volunteered to make

some search of medical literature concerning any federal or state policies or regulations that might be relevant. Dr. Hamilton met with Baxter and Poole informally at a luncheon and showed them an article about AIDS. Baxter asked if there had been an AMA policy on AIDS and other communicable diseases in the workplace.

The annual evaluation for 1988, done in January, 1989, was a surprise to the plaintiff. He was given "4's" on all categories but, under the performance summary, Poole wrote the following:

> The Commercial Sales division's development over the past three years has been very poor—both from the standpoint of recruiting productive agents as well as meeting Company objectives growthwise.

(Plaintiff's Exhibit 36, p. 6)

Poole discussed this comment with the plaintiff on January 25, 1989, and Phelps asked to write a rebuttal, which he did, and which was attached as an addendum to the work performance review report. In that rebuttal, the plaintiff wrote as follows:

> These comments are in response to my most recent work performance review conducted by W. Douglas Poole on January 25, 1989.
>
> I wish to amplify only one portion of the written review—that dealing with the "poor" performance of the Commercial Division.
>
> The Commercial Division lost money in 1988 and in business that is not acceptable. The reasons, however, cannot be attributed entirely to any one individual and can easily be linked to three external causes.
>
> First, Denver experienced its worst year economically in decades. Real estate in general and all brokerage houses suffered substantially.
>
> Second, although the Division sold 90% of its projected third party business, it sold only 10% of its Bank Western inventory. The reason is due to market values declining much lower than the Bank's offering prices. The Bank decided not to reduce the prices of its real estate to meet the present market value.
>
> Third, the confidence of the sales force was shaken when a classified ad was distributed among them advertising for a "commercial division manager". The ultimate result was an immediate re-evaluation by most agents of their desire to remain at FIELD Real Estate Company and, finally, the loss of two agents. This unfortunate circumstance cost the Division a good portion of its productivity from July through October.
>
> These reasons had a combined negative effect on the overall performance of the Division. Once each checks or reverses itself, the Division will perform at or above projected levels.

(Plaintiff's Exhibit 37)

It has been conceded that the sales performance was adversely affected by general market conditions. There is also unrefuted evidence that Baxter was very reluctant to accept offers on bank property which had been acquired through foreclosures at any price less than the book value. That was because he did not want to see the bank record a loss which could have a negative effect on the bank regulators. Also, from his past experience, he believed that the market would soon recover. Sales did not improve and neither did the working relationship between the plaintiff and Poole. Some of the agents left. Phelps was experiencing some health problems related to the stress of his work environment. He felt that he could not confide in Poole or anyone else at Field to discuss his condition.

On August 2, 1989, Phelps found the following memorandum which had apparently been slipped under the door of his office.

> TO: All Agents and Staff
> FROM: W. Douglas Poole
> RE: Management Changes
>
> I am please [sic] to announce that a very capable individual from a major, national brokerage firm has agreed to join Field Real Estate Company as our general manager for sales and leasing. His arrival shall be very soon.
>
> Of course, many changes will be taking place. Present managers will have

their responsibilities changed and in a limited number of circumstances some positions may be merged or eliminated.

I am asking all of you to understand that these changes are for the good of the company. We intend to over come this slow production period and become a truly production oriented firm.

Thank you for your support.

(Plaintiff's Exhibit 44)

Poole also received a copy of this memo. It was not written by Poole. Poole had been planning a reorganization but he was outraged at this leak and premature disclosure. He directed Marsh to try to retrieve the copies which had gone through distribution to a small group of management.

The Field board of directors met on August 4, 1989. Poole presented a plan to restructure the commercial sales and leasing division into three divisions, adopting a more specialized approach. Gene Goodstat, who had been hired in mid-July, would head the industrial division, the retail division was to be managed by Ray Stanley and an office division was to be directed by Tony Leuthold, who was hired to begin August 7, 1989. Phelps was to be relieved effective immediately. The board had reservations about Stanley because of his past performance in leasing but approved the plan with instructions that Stanley should be counseled that his future was limited. He left the company a few months later.

Marsh and Poole met with the plaintiff on August 4, 1989, to tell him that he was being discharged because of poor performance of the division and because of the reorganization. Phelps' response was that he thought he had a job with Field as long as Poole was there; that terminating his employment would terminate insurance benefits and Phelps asked if they knew they were firing someone with AIDS. Poole's response was that he was sorry and that he didn't know that Phelps had AIDS. Marsh also said that he did not know that Phelps had AIDS. Marsh suggested that to continue his health insurance benefits Phelps could stay on as a real estate agent, working on commissions. He could then continue his health insurance at his own expense. Phelps declined.

This offer was repeated in a letter from Walter Kowalchik, resident counsel, to an attorney for the plaintiff, dated August 17, 1989. (Plaintiff's Exhibit 54) That offer was rejected by a letter from plaintiff's lawyer to Walter Kowalchik, dated August 24, 1989. (Plaintiff's Exhibit 56) The complaint initiating this lawsuit was filed November 21, 1989.

██ The plaintiff seeks recovery for a violation of Section 510 of ERISA, 29 U.S.C. § 1140, which provides, in relevant part, as follows:

It shall be unlawful for any person to discipline, fine, suspend, expel, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of any employee benefit plan ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan. The provisions of § 502 [29 U.S.C. § 1132] shall be applicable in the enforcement of this Section.

To prove this claim, the plaintiff must show, by a preponderance of the evidence, that his employer was motivated by an intent to interfere with his right to the benefits under the employee benefit plans in which he was a participant. The parties in this case entered into stipulations of fact, dated June 3, 1991, setting forth the plaintiff's participation in benefit programs, including retirement, health insurance, dental insurance, life insurance and long term disability plans. Those plans are governed by ERISA. Because there is rarely direct evidence of such intention, the courts have suggested the use of the same three stage analysis of circumstantial evidence used in other types of employment discrimination. See *Gavalik v. Continental Can Co.,* 812 F.2d 834 (3rd Cir.1987) and *Dister v. Continental Group, Inc.,* 859 F.2d 1108 (2nd Cir.1988). Under that approach, as it may be applied here, the ultimate question is whether the articulated reason for the discharge has been shown to be pretextual.

Poole personally made the decision to discharge Phelps. Accordingly, the question to be answered was whether Poole fired Phelps because, at least in part, Poole wanted to protect the benefit plans from the impact of the plaintiff's health condition. Put bluntly, was Poole motivated to save the costs of health care, disability and death benefits as the expected consequences of the plaintiff's developing AIDS? Poole testified that he did not know that Phelps had AIDS until the plaintiff disclosed it at the time of termination on August 4, 1989. While that may be true, literally, the court finds that any reasonable person in Poole's position would have been aware of that fact substantially earlier. Poole and Marsh both testified that the only fatal blood diseases that they thought about were leukemia and AIDS. Poole discussed AIDS with Dr. Hamilton. The plaintiff did make it difficult. The letter from Dr. Kerr was carefully crafted to conceal the true facts. There were literal truths in the letter but it was at least dissembling to discuss dioxin. Although Poole expressed satisfaction with the letter, he did not consider it a definite answer. At least by the luncheon with Dr. Hamilton in the summer of 1988, Poole should have known that more was involved. The anonymous notes presented a management problem. Poole did not meet that test of his leadership. When he received the first anonymous note, Poole knew that someone in the organization wanted the manager of the commercial sales division removed. That was a problem no matter what the reason. The response was a disregard of the substance of the message and alarm that someone had invaded the privacy of Poole's private office.

It was Baxter who forced Poole to request the letter from Phelps' doctor and Poole's reaction to that letter was another avoidance of an unpleasant management problem. A pledge of support, confidentiality and protection was inconsistent with the responsibilities of the position Poole held.

There is no doubt that sales performance was a serious problem in the summer of 1988. Apparently, the placement of the ad for a new manager on July 12, 1988, was an awkward effort to motivate Phelps to resign. There was precedent for this approach. In late May, 1988, the Denver Post ran an ad for an executive secretary. Diane Perry, who was then an executive secretary and assistant to Poole and Marsh, saw that ad, recognized that the post office box shown was used by Field and assumed that it was her position. She confronted Poole who first denied placing the ad and then admitted it after bringing Marsh into the conversation. Poole told Perry that her performance was not the issue but it was her time away from work for physical therapy after knee surgery. That had been an issue which had been discussed before the surgery. Ms. Perry's response was to look for work elsewhere and she quit on October 1.

The result of the ad placement for the plaintiff's position was further erosion of management authority.

For whatever reason, Poole failed to confront Phelps directly about his health. The lack of candor between these two men affected the working relationship between them. Yet, a failure of leadership or ineffective management of this difficult situation are not equivalent to discriminatory treatment for the purpose of protecting the assets of the employee plans.

There is evidence concerning the possible impact on the health insurance plan, the long term disability plan and the life insurance program from the costs and expenses of AIDS as a progressive disease resulting in death. There is no evidence that Poole, Marsh or anyone else in Field's management made any such calculations or even expressed any awareness of such consequences. Moreover, the evidence presented does not make a persuasive case that the impact would be catastrophic or particularly significant, given the fact that Field employees were in a common pool with the people working at the other subsidiaries of WCIC for these benefit programs. There is also the fact that the termination was not made until more than fourteen months after the first disclosure concerning Phelps' medical condition.

Additionally, the evidence strongly supports a finding that the performance of the commercial sales division failed to meet the expectations of Poole and the board of directors. There was, then, a factual basis for the reason given for discharging Phelps. Any unfairness or unreasonableness in holding him responsible for the failed performance is relevant only if it can be attributable to an intent to use that failure as a screen for an intent to prevent him from receiving plan benefits when his condition worsened. It must be remembered that he had no apparent signs or symptoms of illness from AIDS before he was fired from Field.

Considering all of the evidence, the court finds and concludes that the plaintiff has failed to prove the requisite intent for a violation of 29 U.S.C. § 1140.

■■■■ The plaintiff also claims handicap discrimination as prohibited by Colorado statute, C.R.S. § 24–34–402(1)(a), providing as follows:

24–34–402. *Discriminatory and Unfair Employer Practices.* (1) It shall be a discriminatory or unfair employment practice:

(a) for an employer to refuse to hire, to discharge, to promote or demote, or to discriminate in matters in compensation against any person otherwise qualified because of handicap, race, creed, color, sex, national origin, or ancestry, but, with regard to a handicap, it is not a discriminatory or unfair employment practice for an employer to act as provided in this paragraph (a) if there is no reasonable accommodation that the employer can make with regard to the handicap, the handicap actually disqualified the person from the job, and the handicap was a significant impact on the job;

To prove his claim, the plaintiff must prove that he was discharged or discriminated against because of a handicap. The defendants agree that having AIDS or being HIV-positive is a handicap within the definition of the statute, C.R.S. § 24–34–301(4). Liability requires a showing that the employer knew or should have known of the physical condition and need for ac-

commodation. *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1381–82 (3rd Cir.1991) (applying comparable legislation). When an employee prevents the employer from an awareness of a handicap, there is no liability. *Leckelt v. Board of Commissioners of Hospital District No. 1,* 909 F.2d 820, 830 (5th Cir.1990) (applying comparable legislation). While Poole can be charged with knowledge that Phelps had an AIDS related condition, there is no evidence that he had or should have had an appreciation of any need for special accommodation. The plaintiff was not an active AIDS case while he was at Field. He was HIV-positive without illness. Physically he could perform the duties of his position. He did not ask for any special consideration.

It is not clear from the evidence what accommodation could have helped. Phelps wanted to keep his condition private and secret. Accordingly, the program of education in the workplace, suggested in the testimony of Dr. Robert Cox, was not possible.

The termination of employment decision was based on a business judgment by Poole. Poole had reason to be angry with Phelps and to suspect him of planting the August 2 memorandum. Phelps had been manipulative and secretive. He had not functioned as one would expect of a member of a management team. To impose liability on the defendants in this case would require a ruling that an employer has an obligation of paternalism that would deny both dignity and privacy to the employee. If it is suggested that an employer with a legitimate business reason to discharge an employee may not do so if the consequence may be difficulty in obtaining insurance for a handicapped employee, the law would impose a protectionist philosophy far beyond the expressed legislative intention in this statute.

Upon the foregoing, and the ultimate finding that the plaintiff has failed to prove his claims, it is

ORDERED that the court finds for the defendants and the Clerk will enter a judgment dismissing the plaintiff's claims and

awarding the defendants their statutory costs under 28 U.S.C. § 1920.