Deborah ARNETT, Plaintiff,

v.

TUTHILL CORPORATION, FILL–RITE DIVISION, Defendant.

No. F92–205.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

March 30, 1994.

Samuel W. Jarjour, Snow and Sauerteig and Russel Strunk, Warsco, Brogan and Strunk, Fort Wayne, IN, for plaintiff, Deborah Arnett.

Ronald J. Hein, Jr., Sheila M. Brennan, Franczek, Sullivan, Mann, Crement, Hein & Relias, P.C., Chicago, IL and Matthew J. Connelly, Blume, Wyneken, Connelly, Jordan & Stucky, Fort Wayne, IN, for defendant, Tuthill Corp.—Fill–Rite Div.

### MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION

This matter is before the Court [1] on Defendant's, Tuthill Corporation, Fill–Rite Division's ("Fill–Rite"), motion for partial summary judgment, filed January 18, 1994. Plaintiff's, Deborah Arnett's, ("Arnett") response was filed February 2, 1994 and Defendant's reply was filed February 10, 1994. The record on summary judgment consists of Arnett's affidavit, excerpts from Arnett's deposition; Arnett's college transcript; a section of the September 9, 1993, Fort Wayne Journal Gazette; a copy of the Tuthill Corporation Salaried Employee's Handbook and excerpts from the depositions of various officers and employees of the Defendant.

On March 16, 1994 during a telephonic hearing the Court orally denied Defendant's motion for summary judgment on Plaintiff's Equal Pay Act Claim, 29 U.S.C. § 206 *et. seq.*, but continued to take under advisement Defendant's motion for summary judgment on Plaintiff's ERISA claim. For the reasons stated below Defendant's motion for summary judgment on Plaintiff's ERISA claim is GRANTED.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Fill–Rite is a division of Tuthill Corporation that is engaged in the design and manufacture of fuel management systems at its facility in Fort Wayne, Indiana. (Jenkins Dep. p. 4). In 1981 Fill–Rite created an

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

electronics manufacturing department at the Fill–Rite plant. (Burns Dep. p. 18). That department was headed up by Robert Burns ("Burns"). *Id.* Burns remained foreman of the electronics manufacturing department until 1985 or 1986 when Fill–Rite began manufacturing a complex credit card system. *Id.* at 19. At that time Burns determined he could not handle both the supervisory responsibilities and technological duties of his position. *Id.* Fill–Rite and Burns agreed that he would relinquish his supervisory or administrative duties and concentrate solely on his technological responsibilities. *Id.* at 20, 31. In 1986 Burns gave up his foreman title and in 1986 James Auman took over the role. (Auman Dep., p. 8).

By mid–1987 the primary product manufactured in the electronics department was a card-activated, fuel-control system called the "500 system." *Id.* at 12; (Jenkins Dep., p. 73). During production of this product Fill–Rite discovered that the failure rate of certain circuit boards used in the system ("CPU boards") was unusually high. (Auman Dep., p. 12). The faulty circuit boards were set aside, and by August 1990 the number of faulty boards had accumulated to almost 90. *Id.* at 13. This pile, commonly referred to in the electronics department as the "bone pile," became a very costly expense to Fill–Rite because each board was worth approximately $500.00. *Id.*

In an effort to remedy this situation, on August 5, 1987, Fill–Rite hired Arnett as an electronics technician. (Auman Dep., p. 12; Arnett Dep. p. 15). Her primary responsibility was to troubleshoot or identify the problems in the faulty boards and then make the necessary repairs. (Auman Dep., p. 13). However, as her employment continued she began to assume other responsibilities as well.[2] (Arnett Affidavit). Arnett was initially hired as a part time employee. (Arnett Dep., p. 18–21). After two months she began to work as a probationary, full-time employee and finally in January of 1988, Arnett became a full-time, salaried employee. *Id.* One of the benefits of her newly acquired

full-time status was health insurance. *Id.* at 105–106. This insurance coverage was provided at no cost to and extended to herself and immediate family (children and spouse). *Id.*

In November of 1989, Arnett was diagnosed as HIV positive. *Id.* at 67–78. She had contracted HIV from her husband, who also was HIV infected. *Id.* Arnett informed Len Wright, manager of manufacturing, and George Jenkins ("Jenkins"), president of Fill–Rite, of her HIV status immediately after being diagnosed. *Id.* at 70–72. It is unclear whether, at this time, she disclosed that her husband was also infected. Around that same time Arnett also told Burns, *Id.*, and sometime during 1990 she also informed Auman. (Auman Dep., p. 35). Arnett chose to tell others in the electronics department that she was suffering from leukemia, however she did eventually disclose to a few other employees that she was HIV positive. (Arnett Dep. p. 67–68). Juanita Seabaugh, Fill–Rite's accounts payable administrator also learned of Arnett's HIV status early on, by virtue of her responsibility to process health insurance claim forms. (Seabaugh Dep., p. 15–16).

Arnett's employment duties did not change after she informed Fill–Rite that she was HIV positive. In fact they remained the same until her termination in November 1991. (Arnett Dep., p. 73).

In October of 1990 Joseph Clemens ("Clemens") replaced Len Wright as the manager of manufacturing. (Clemens Dep., p. 13, 14, 57). Arnett did not tell Clemens that she was HIV positive until early spring of 1991. *Id.* At that time she also told Clemens that her husband was infected with the virus. *Id.*

On one occasion Auman inquired whether Arnett's children were also infected with the virus, and Arnett informed him that they were not. *Id.* at 118.

In April of 1991, Arnett suffered from a severe urinary tract infection. (Arnett Dep. p. 90–93). As a result Arnett missed a full month of work, and was restricted to half-

---

**2.** As stated in the March 16, 1994 hearing, the exact nature of Plaintiff's responsibilities remains an ultimate issue of fact relating to Plaintiff's

Equal Pay Act claim, and has been reserved for trial.

days for two months thereafter. *Id.* During her absence Auman approached Seabaugh and asked if Arnett was truly HIV positive. Seabaugh informed Auman that she could not discuss such information as it was confidential. (Seabaugh Dep. p., 18; Auman Dep., p. 39–40) Auman was also warned by Jenkins that such an inquiry was inappropriate and he should not do it again. *Id.*

Eventually, Arnett received several phone calls from both Auman and Clemens, who complained about the length of her absence. (Arnett Dep. 92–94). Clemens also required her to come into the office to explain her lengthy absence. *Id.* They attributed the long recovery period to her HIV status, alleging that a person who was not HIV positive would have been able to recover much faster. *Id.*

Nevertheless, Arnett apparently returned to her regular work schedule and continued to work with no problem until November. During November Tuthill entered into a new collective bargaining agreement with the Union employees, which required employees who wished to continue family health care coverage to contribute $6.00 a week. (Clemens Dep., p. 55). This contribution requirement was applicable not only to union employees but salaried employees as well. *Id.* As part of administering this new fee, Seabaugh and Clemens met with all the Fill–Rite employees in order for them to fill out an election form identifying whether they wanted individual or family coverage. (Seabaugh Dep., p. 28). Clemens met with all employees in the electronics department. *Id.* at 23–24.

Clemens met with Arnett on November 20, 1991. (Clemens Dep., 55; Arnett Dep., p. 108). What transpired at that meeting is strongly disputed by the parties. Arnett alleges that despite previously receiving family coverage, when she entered Clemens office he had already checked the single coverage box. (Arnett Affidavit, ¶ 9). She then told Clemens she wanted to confer with her husband before making a decision, and she called her husband from Clemens' office. Following the telephone conversation Arnett told Clemens that she wished to elect family coverage. Arnett claims that Clemens appeared angry, his face was wrinkled, and his displeasure evident. (Arnett Dep., 112–113). He then whited out the individual selection and changed it to family coverage. *Id.* Arnett then left Clemens' office and told a few of her coworkers that she thought she would be fired over the incident. *Id.* at 122–129.

Clemens has a different version of what occurred in his office that day. According to Clemens, when Arnett came into his office he asked her to choose between individual and family coverage. (Clemens Dep., p. 55). He claims Arnett responded that because she had family coverage under her husband's plan she thought it might be better to select individual coverage rather than incur the weekly payment. *Id.* Accordingly, Clemens marked single coverage on her election form. *Id.* However, she then expressed concern that she should confer with her husband prior to making the decision. *Id.* Clemens let her use the phone in his office. *Id.* She called her husband, and following their conversation changed her mind, and indicated she would like to retain family coverage. *Id.* Clemens immediately whited out the individual mark and checked the family coverage box. *Id.*

In the meantime, Fill–Rite had been experiencing a slow down in electronic sales during 1991—particularly the 500 system which accounted for about eighty percent of the total electronic department sales. (Jenkins Dep., p. 5, 12, 39). Sales of the 500 system dropped from 20 to 25 units a month in 1990 to 12 to 15 a month in 1991. *Id.* Fill–Rite attempted to reverse this downward trend by lowering the price of the system and by making changes to the product's software and hardware. *Id.* at 86–88. These efforts proved only marginally successful. *Id.*

In mid-year 1991 the company began looking at other alternatives, including reducing costs associated with manufacture of the 500 system. *Id.* at 38, 40–44. Fill–Rite began downsizing the electronics department workforce by transferring union workers out of electronics and into other departments. (*Id.* at 42; Clemens Dep., p. 30, 94). Ultimately, Fill–Rite claims it was forced to implement a reduction in force among the salaried personnel in the electronics and engineering depart-

ments. (Jenkins Dep., pp. 36, 40–41; Clemens Dep. p. 21). According to Fill–Rite this decision was finally reached by Jenkins and his staff in a meeting during the second or third week in October of 1991. (Clemens Dep., p. 39). Clemens was given the responsibility for evaluating and recommending to Jenkins who, among the two salaried employees (Arnett and Burns) in electronics department, would be terminated. *Id.* Clemens describes his evaluation process as a comparison of the functions and performances of the individuals involved. *Id.* Based on these factors Clemens decided that Arnett was more expendable than Burns, and during the third week of October he made his recommendation to Jenkins that Arnett be terminated. (Clemens Dep., p. 42–43).

Jenkins agreed with Clemens, and a final decision to terminate Arnett was made in the third week of October 1991. (Jenkins Dep., 91–94). Although they had affirmatively established that Arnett would be the salaried employee terminated, they did not decide when that separation would occur, and according to Jenkins and Clemens they were to proceed with business as usual until she was formally separated from employment. (Jenkins Dep., p. 36–37; Clemens Dep., p. 48). So, in that regard Arnett was treated like all other employees for the purposes of health insurance election and she was even given her standard yearly pay increase.

Jenkins finally made the decision to terminate Arnett on November 22, 1991—just two days after her alleged confrontation with Clemens over election of family coverage. (Clemens Dep., p. 52–54). Jenkins called Clemens into his office that morning and informed him that Arnett would be terminated that day. *Id.* Later, around noon, Jenkins, Clemens, Auman and Arnett all met in Jenkins office. *Id.* At that time Jenkins informed Arnett she was being terminated due to a reduction in the work force. *Id.;* (Arnett Dep., p. 120–122). She was also in-

formed that she would receive severance pay and medical coverage through the end of the year. (Jenkins Dep., p. 48; Clemens Dep., p. 55). At that time Arnett, who was angry over the news, and apparently on her way to a funeral, walked out of the meeting before it had concluded.

Jenkins asserts that later that day Arnett called him, and during their conversation Arnett requested that Jenkins switch her earlier insurance selection of family coverage to single coverage. (Jenkins Dep., p. 97). On November 25, 1991 Jenkins memorialized that conversation in a letter to Arnett. *Id.* During that letter he reemphasized that her termination was the result of a reduction in force of salaried employees due to the slowdown in sales. (*Id.* at exhibit 1). He further notified her that pursuant to her request he would not activate the $6.00 per week deduction for dependent insurance coverage, and that her single coverage would continue through the end of the year, at which time she would be entitled to elect COBRA continuation coverage. *Id.*

In response to this letter Arnett wrote back to Jenkins that she did wish to receive family coverage just as she had indicated during the November 20, 1991 meeting with Clemens. (Arnett Dep., exhibit 11). Fill–Rite apparently complied with that request. Since Arnett's termination Burns has assumed her responsibilities, and she has never been replaced.

During 1993, Fill–Rite's business picked up and it began running newspaper ads that it had two openings for Technical Service Representatives. (Arnett Affidavit, exhibit 2). Arnett applied for these positions but was turned down. (Arnett Affidavit, ¶ 7).

On December 13, 1992, Plaintiff filed a charge with the EEOC alleging sexual harassment and gender and handicap discrimination.[3] On June 19, 1992 the EEOC issued a right to sue letter. On September

---

**3.** Plaintiff did not plead her handicap discrimination theory in the original complaint, believing at that time she had insufficient evidence to establish such a claim. However, on December 9, 1993, Plaintiff filed a motion for leave to file an amended complaint in order to, among other things, add a claim for handicap discrimination under the Indiana Civil Rights Act and the Fort Wayne City ordinance. That motion was denied on the grounds that Plaintiff had unnecessarily delayed in bringing the amendment and Defendant would be unfairly prejudiced by amending the complaint so close to trial. (Minutes of 1/21/94 hearing).

17, 1992 Arnett filed her original complaint against Defendant alleging sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et. seq.*, and discrimination in violation of the Equal Pay Act, 29 U.S.C. 206 *et. seq.* and ERISA, 29 U.S.C. 1001 *et. seq.* Plaintiff filed her amended complaint on January 24, 1991 adding a claim for damages under the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

On January 18, 1994, Defendant filed its motion for partial summary judgment. Specifically, Defendant sought judgment on Plaintiffs Equal Pay Act claim and ERISA claim. Defendant's motion was denied as to the Equal Pay Act claim by this Court on March 16, 1994, during a telephonic hearing. All that now remains before the Court is Defendant's motion for summary judgment of Plaintiff's ERISA claim.

### III. SUMMARY JUDGMENT PRINCIPLES

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512; *In re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 477 U.S. at 249–251, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude

summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. FED.R.CIV.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

## IV. DISCUSSION

■ Arnett alleges that Fill–Rite discriminated against her in violation of section 510 of ERISA, 29 U.S.C. § 1140 when it fired her with an intent to deprive her of her family health insurance coverage.

Section 510 makes it

unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under provisions of an employee benefit plan.... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140. Discharging an employee for the purpose of depriving her of continued participation in a company-provided medical insurance plan is a violation of section 510. *Kross v. Western Elec. Co., Inc.,* 701 F.2d 1238, 1243 (7th Cir.1983).

■ To establish such a claim a plaintiff "must prove a specific intent of the employer to interfere with an employee's [insurance benefit] rights." *Conkwright v. Westinghouse,* 933 F.2d 231 (4th Cir.1991); *see also Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1111 (2nd Cir.1988); *Massie v. Indiana Gas Co.,* 752 F.Supp. 261, 267 (N.D.Ind.1990). "Because the existence of a specific intent to interfere with an employee's benefit rights is critical in § 510 cases—yet is seldom the subject of direct proof— ..." courts have used the three step analytical framework for indirect proof used in Title VII and ADEA cases, as set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas,* a plaintiff has the burden of establishing a *prima facie* case of discrimination. If successful the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the alleged wrongful conduct. Should the defendant carry this burden then the plaintiff must show that defendants proffered reason is a pretext for discriminatory intent. *Id.* at 802, 804, 93 S.Ct. at 1824, 1825.

Fill–Rite alleges that Arnett has failed to produce sufficient evidence to make out a *prima facie* case because the record is devoid of any facts that suggest Arnett was terminated for the purpose of depriving her of her health insurance benefits. Moreover, Fill–Rite argues that even if it is assumed *arguendo* that Arnett has established a *prima facie* case of discrimination, Fill–Rite has offered a legitimate, non-discriminatory reason (a reduction in force) for her termination and Arnett has no evidence that the proffered reason is pretextual.

Arnett's response is twofold. First, she argues that she has presented direct evidence of discrimination, so the *McDonnell Douglas* burden shifting analysis is inapplicable, and therefore she need not offer any evidence to rebut Fill–Rite's proffered reason for her termination. In the alternative, Arnett argues that if *McDonnell Douglas* does apply she has presented *prima facie* and rebuttal evidence sufficient to withstand a motion for summary judgment. In support of her first argument, Arnett offers the following facts to suggest that she has presented direct evidence of discrimination:

1) When Auman became aware that Arnett and her husband were HIV positive he wanted to know if her children were also infected.

2) Clemens and Auman assumed that her leave of absence in late spring of 1991 was HIV related.

3) In September 1991 Richard Simmons, a coworker, developed full blown AIDS and took permanent medical leave.

4) In October of 1991 Fill–Rite laid off Dave Gerchak, a salaried employee in the engineering department, and who was "commonly perceived as gay."

5) On November 20, 1991 Arnett and Clemens had a confrontation over her election of family, rather than single, health insurance coverage.

6) After the alleged confrontation, Arnett left Clemens' office and told several coworkers she thought she would be fired as a result.

7) She was actually terminated just two days after this alleged confrontation.

8) Just a few days after she was terminated, Arnett received a letter from Jenkins which stated that she had elected single rather than family coverage despite her earlier request for family coverage.

Arnett alleges that the aforementioned factual allegations are direct evidence of discrimination, and that direct evidence is independently sufficient to oppose summary judgment, thereby relieving her of any burden of establishing pretext.

 Before addressing Arnett's claims the Court must address a preliminary evidentiary matter. That being whether the court should consider Arnett's offered evidence that another salaried worker who was laid off was commonly perceived as gay; and evidence that Arnett told her coworkers she thought she would be fired after her confrontation with Clemens. "Supporting materials designed to establish issues of fact in a summary judgment proceeding 'must be established through vehicles designed to ensure reliability and veracity—depositions, answers to interrogatories, admissions and affidavits.'" *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir.1987) (quoting *Martz v. Union Labor Life Insurance Co.*, 757 F.2d 135, 139 (7th Cir.1985). The information set forth in those materials may be considered only if it would be admissible evidence at trial. *Horta v. Sullivan*, 4 F.3d 2, 8–9 (1st

Cir.1993); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 584–85 (6th Cir.1992). Rule 602 of the Federal Rules of Evidence provides that a witness may testify only to matters of which she has personal knowledge. FED. R.EVID. 602. So, rumors, conclusory allegations and subjective beliefs contained in affidavits or other discovery materials are not admissible and cannot be considered in support of, or in opposition to, a motion for summary judgment. *Cormier v. Pennzoil Exploration & Production Co.*, 969 F.2d 1559, 1561 (5th Cir.1992). Accordingly, any rumors pertaining to Gerchak's sexual orientation may not be considered by this Court. Nor may the Court consider Arnett's subjective belief that she would be fired after her meeting with Clemens. Having so held, we now turn to the remaining admissible evidence and Arnett's arguments.

 Arnett correctly points out that once a plaintiff presents direct evidence of discrimination no inquiry need be made into whether plaintiff can establish pretext. *Gavalik v. Continental Can Co.*, 812 F.2d 834, 853 (3rd Cir.1987) *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). However, she is incorrect when she characterizes her evidence as direct, for it is clearly circumstantial. Direct evidence is direct proof of discriminatory intent, "such as discriminatory statements uttered by the employer's decisionmaker." *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370 (7th Cir.1992). Circumstantial evidence is evidence which does not provide direct proof, but, creates an inference of discriminatory intent. So, the necessity of this inferential step makes the evidence indirect proof. Arnett has not presented any direct evidence of discrimination. Rather, her evidence requires an inferential step (indeed several) to reach the conclusion that her termination resulted from a discriminatory intent to deprive her of her health insurance benefits. Accordingly, the proper analytical approach is the *McDonnell Douglas* burden shifting analysis.

 The first stage in that three step process is to determine whether Arnett has established a *prima facie* case of discrimina-

tion. To make out a *prima facie* case under Section 510

> the plaintiff must show that [she] (1) belongs to the protected class, (2) was qualified for the position involved, and (3) was discharged or denied employment under circumstance that provide some basis for believing that the prohibited intent was present.

*Massie,* 752 F.Supp. at 268 (quoting *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 347 (3d Cir.1990)). The parties do not appear to dispute that plaintiff belonged to a protected class and was qualified for the position involved. The disagreement focuses on whether Arnett has provided evidence that provides some basis for believing she was terminated with the intent of depriving her of her health insurance benefits.

After a careful review of the evidence presented, and construing it in the light most favorable to plaintiff, as we must, the Court agrees with the Defendant that no reasonable jury could infer that the prohibited intent was present. Arnett's evidence that several months before her termination Auman inquired into whether Arnett's children were also HIV infected; and five months before her termination Clemens' and Auman's exhibited displeasure over Arnett's lengthy leave of absence and a belief that her illness was HIV related are not suggestive of any prohibitive intent. While these actions may exhibit a lack of knowledge regarding HIV and AIDS, and may evidence a lack of compassion on their part for Arnett's condition, they do not suggest an intent to deprive her of her health insurance benefits.

As for the evidence that another employee, Richard Simmons, suffered from full blown AIDS and took medical leave in September 1991, this evidence seems to weigh against any inference of discrimination, because he was not fired or denied benefits in any way. Rather he voluntarily took medical leave, and eventually elected COBRA continuation coverage. Fill–Rite apparently paid all of Simmons' medical bills without incident. This all suggests that Fill–Rite did not have any intent to rid itself of all HIV positive and AIDS employees, as Plaintiff would suggest.

Arnett also argues that her termination, just two days after her disagreement with Clemens over her election of family coverage, is sufficient evidence to establish a *prima facie* case. Arnett argues that the temporal proximity of these events creates a reasonable inference that her termination was the result of her refusal to accept individual health insurance. In a sense, she claims her termination was retaliation for exercising her rights under the companies health benefit plan. A plaintiff may use the proximity of time between the protected activity and the adverse employment action as circumstantial evidence of discriminatory intent. While a short time period may give rise to an inference that the action taken was retaliatory, evidence of proximity may not be considered in the abstract, rather it must be taken in the context of the facts and circumstances of the particular case. *Hamann v. Gates Chevrolet, Inc.,* 910 F.2d 1417, 1420 (7th Cir.1990); *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1314 (6th Cir.1989); *Kimbro v. Atlantic Richfield Co.,* 889 F.2d 869, 881 (9th Cir.1989) *cert. denied,* 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 28 (1990).

Any inference to be drawn from the rapidity and proximity in this case is negated by the other facts and circumstances present in the record. First, Fill–Rite learned that Arnett was HIV positive in November 1989, when she told Jenkins and Wright about her diagnosis. Despite having this knowledge, Fill–Rite did not terminate Arnett for nearly two years. Moreover, during that two year period Fill–Rite paid out all of Arnett's claims without incident, and took no action in the interim to deprive Arnett of any health insurance benefits she received as part of her employment. Nor is there any suggestion that Arnett's use of benefits had increased shortly before her termination. *Kimbro,* 889 F.2d at 881. This long delay suggests that no prohibitive intent was at work in the decision to terminate Arnett. *Hamann,* 910 F.2d at 1420. (Any inference of retaliation drawn from time period between termination and plaintiff's refusal to illegally alter documents negated by fact that plaintiff had refused on 20 other occasions in prior two years, and had never been subjected to any

disciplinary action); *Phelps v. Field Real Estate Co.*, 793 F.Supp. 1535, 1543 (D.Colo. 1991) *aff'd*, 991 F.2d 645 (10th Cir.1993) (Termination nearly fourteen months after employer knew plaintiff was HIV positive weighs against any inference of prohibitive intent).

Additionally, Fill–Rite had a statutory obligation under ERISA to offer Arnett the opportunity to elect COBRA continuation coverage. At the time of her termination Fill–Rite had no knowledge whether Arnett would elect such coverage, and if she had Fill–Rite would be obligated to provide her with family health coverage for an additional 18 months. 29 U.S.C. 1162(2)(A).

Finally, both Jenkins and Clemens testified at their depositions that the decision to terminate Arnett was made during the third week of October—one month before the insurance meeting and ultimate termination. Arnett correctly points out that there was no physical documentation of this decision, and it is virtually impossible for her to disprove this assertion. Nevertheless, the Court cannot ignore the sworn testimony of two witnesses, and when this evidence is combined with the other aforementioned facts only one conclusion can be reached—that the temporal proximity evidence creates no inference of an intent to deprive Arnett of her health insurance benefits.

The final piece of evidence presented by Arnett is the letter from Jenkins to Arnett regarding their telephone conversation on the afternoon of her termination. Jenkins asserts that later that day Arnett called him, and during their conversation Arnett requested that Jenkins switch her earlier insurance selection of family coverage to single coverage. On November 25, 1991, Jenkins memorialized that conversation in a letter to Arnett which stated that pursuant to her request he would not activate the $6.00 per week deduction for dependent insurance coverage and that her single coverage would continue through the end of the year. Arnett characterizes this letter as another attempt to deprive her of family coverage. The court disagrees. The only reasonable inference that can be drawn from this letter

is that Arnett and Jenkins simply had a miscommunication.

Arnett has failed to present any evidence showing that she was "discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent was present." *Massie*, 752 F.Supp. at 268 (S.D.Ind.1990) (quoting *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 347 (3d Cir.1990)). Accordingly, she has failed to make out a *prima facie* case of discrimination.

Moreover, even assuming *arguendo* that the evidence presented established a *prima facie* case, Arnett still cannot meet her additional burden of showing that Fill–Rite's proffered reason for her termination is pretextual. Fill–Rite alleges that Arnett was fired as the result of a reduction in force designed to cut costs associated with manufacture of the 500 series, for which there had been a decline in sales. Having articulated a legitimate and nondiscriminatory reason for the termination the burden shifts to Arnett to establish that the proffered reason is merely a pretext for a discriminatory reason.

■ A plaintiff may show pretext by direct evidence that discrimination more likely motivated the employer (not present here), or circumstantial evidence that the employer's proffered explanation was not the true reason and discrimination was. *St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Untruthfulness may be demonstrated through evidence showing:

> (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate ... the adverse employment action or (3) that they were insufficient to motivate the adverse employment action.

*Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 428 (7th Cir.1989) (quoting *Kier v. Commercial Union Ins. Co.*, 808 F.2d 1254, 1259 (7th Cir.1987) *cert denied*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987)).

Arnett presents two theories to rebut Fill–Rite's allegations of reduction in force. Although, Arnett concedes that there was a slow down in business in the electronics de-

partment, she contends the decision to fire her, rather than Burns, was not a sound business decision because she was better qualified and had a lower salary than Burns. Thus, she argues, had Fill–Rite truly engaged in a reduction of force designed to cut manufacturing costs, it should have terminated Burns, not her. So, as Arnett sees it, by firing her an inference arises that the reduction in force was not the true reason for her termination. However, "the issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *McCoy*, 957 F.2d at 373. "[E]ven if [Arnett] was the best possible person for the job, so long as [Fill–Rite] honestly believed [s]he was not, its business judgment will not be second-guessed by federal courts applying [ERISA]." *Id.* The record contains credible evidence that Fill–Rite experienced a decline in sales, (Plaintiff concedes this point), and that efforts were undertaken to cut costs, including a reduction in force. Burns has assumed Arnett's responsibilities, and she has never been replaced. It cannot be said that the decision to terminate Arnett instead of Burns was " 'so ridden with error' that the employer obviously could not honestly have relied on it." *Dister*, 859 F.2d at 1113 (citing *Lieberman v. Gant*, 630 F.2d 60, 65 (2nd Cir.1980)). So, no inference of untruthfulness arises from this evidence.

Next, Arnett argues that there are inconsistencies between the testimony of the various managers at Fill–Rite regarding the decision to terminate Arnett, thereby suggesting that the reduction in force was not the true reason for her termination. "An employee may defeat summary judgment by producing 'evidence of inconsistencies and implausibilities in the employer's proffered reasons for discharge [which] reasonably *could* support an inference that the employer did not act for nondiscriminatory reasons....' " *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 343 (3rd Cir.1990). Arnett points to two alleged inconsistencies. First, Arnett claims that Jenkins testified that Auman and Burns participated in the decision to terminate Arnett, while Auman

and Burns maintain they knew nothing about the decision until it was implemented. This allegation is simply contrary to the evidence in the record. Nowhere in the record does the Court find that Jenkins claimed Auman and Burns assisted in making the decision to terminate Arnett, and, not surprisingly, Plaintiff's brief does not cite to the record to support this allegation. Jenkins' and Clemens' testimony clearly establishes that Clemens made the requisite comparison of Burns and Arnett. (Clemens Dep., p. 42–44; Jenkins Dep., pp. 44–48). He then made his recommendation to Jenkins. Finally, Jenkins, based on that recommendation, decided to terminate Arnett. *Id.* That testimony is consistent with Auman's and Burns' testimony and raises no inference of untruthfulness.

Finally, Arnett contends that Clemens assertion that he conducted a careful and thorough comparison of Arnett's and Burns' performance and responsibilities is belied by the fact that he was unfamiliar with slang term "bone pile"—the term used by workers in the electronics department to refer to the pile of defective CPU boards that Arnett worked on. This evidence does not suggest untruthfulness because, despite his lack of familiarity with the term "bone pile," he did exhibit a familiarity with her actual responsibilities and performance. (Clemens Dep., p. 42–44). This sole piece of evidence does not create an inference that the proffered reason was not worthy of credence. Accordingly, Arnett has failed to meet her burden to show pretext and her effort to ward off summary judgment has proven unsuccessful.

## V. CONCLUSION

Plaintiff has presented no genuine issue of material fact in support of claim under section 510 of ERISA, 29 U.S.C. § 1140. For the reasons stated above Defendant's motion for summary judgment on Plaintiff's ERISA claim is GRANTED.